**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **MICHELE FREADMAN,** <br> **Plaintiff,** <br> **v.** <br> **METROPOLITAN PROPERTY AND CASUALTY INSURANCE COMPANY,** <br> **Defendants.** | : | **C. A. No. 01-628ML** |

**PLAINTIFF'S REVISED[1] MEMORANDUM IN SUPPORT OF HER OBJECTION TO REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE DATED MARCH 31, 2005**

**BRIEF SUMMARY OF FACTS**

In January 1993, Plaintiff, Michele Freadman (hereinafter "Freadman"), began working for defendant, Metropolitan Property and Casualty Insurance Company (hereinafter "Met"). By all accounts, she was a rising star. Within a short time, she was promoted and was responsible for high-profile, company-wide projects. *See Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment* p. 1-2 ("*Opposition Memo*").[2] According to Defendant, she stood a good chance at being further promoted to the officer position. *Freadman Affidavit* ¶ 5. She continued on this path, without interruption until March 1999. At that point, she developed ulcerative colitis. As a result, she was forced to take a medical leave of absence. *Opposition Memo* p. 5. Freadman's

[1]Plaintiff is submitting an errata sheet with typographical corrections. For the Court's ease of reference, this "revised" memorandum incorporates the changes in the errata sheet.

[2]To the extent there are additional facts in Plaintiff's Opposition Memo, Freadman incorporates them here.

condition required her to first be hospitalized for months and then, for a period of time, convalesce at home. *Id.* p. 3. Shortly before returning to work, her supervisor Bob Smith visited her at home. *Id.* p. 3, *Report & Recommendation of the Magistrate Judge* ("R&R"), p 6. Freadman told Smith about her ulcerative colitis and how this limited her ability work long hours. Freadman Affidavit ¶ 8. Specifically, she told him she needed to be given less hours, fewer last-minute time driven deadlines, an adequate staff and a better work-life balance <u>because of her disability</u>. *See id.*

Plaintiff returned to work on July 15, 1999. *Opposition Memo* p. 4. Upon her return, she was surprised to learn that Met had decided to remove her three core functions (training, compliance and performance enhancement). R&R p. 7. In its place she was assigned a low-profile, little-known project called the Ease of Doing Business ("EDB"). *Opposition Memo* p. 4. Despite this turn of events, Freadman dedicated herself to EDB. She began to work as hard as she had before, quickly increasing her part-time hours to full-time, in order to meet the demands of her new assignments. Because of this, Met rewarded her. Within six months she received two salary increases. R&R p. 34. In February 2000, she received the highest possible performance rating. *Opposition Memo* p. 4; *Freadman Deposition* p. 196-97. In March 2000, she was given her 1999 bonus which was substantial, as well as a commendation letter from Chris Cawley, Bob Smith's supervisor. Although she was not told at the time, she received multiple nominations to be on the success planning list. *Opposition Memo* p. 2, n.2, *Plaintiff's Answers to Interrogatories*, No. 13, p. 67 ("*Answers*"), *Cawley Deposition* p. 186-87.

Although Freadman continued to have problems with her ulcerative colitis after she returned to work, she did not have to take time out of work. *Freadman Affidavit* ¶ 18, *Dr. Wolf Affidavit* ¶ 13. However, her condition began to deteriorate. *Wolf* ¶ 13. Around March 23 – when her hardest working subordinate, Sue McGuirkin, left the company – Freadman had a frank discussion with

Smith. She told him that she was concerned about losing McGuirkin because she was already working long hours and she would not be able to keep her work on track without getting sick again. *Answers No. 14*, p. 74-75, No. 11, p. 56. Freadman's health continued to decline.

In May 2000, CEO Cathy Rein directly gave Freadman an assignment. Rein asked Freadman to give a presentation before the officers group on June 9. Rein told Freadman she wanted a presentation similar to the one Freadman had given in December 1999 on the Instrument Panel. *Answers Supplement* No. 4, p. 2. Cawley was the executive sponsor of the presentation. The presentation would give Freadman additional exposure to the officers group. At the end of the month, on May 31, 2000, Freadman e-mailed both Rein and Cawley with the proposed presentation. *Answers* No. 13, p. 66, *Freadman Deposition* p. 121, 273. Rein approved it. *See id.* At that time, she received no response from Cawley. *Answers* No. 13, p. 66.

Within 3 days, Freadman had to have another frank discussion with Smith. She told him that she was still working too hard and that she could not work long hours (including nights and weekends) without having her symptoms return. Therefore, she asked for time off because her symptoms were returning. *Opposition Memo* p. 5; *Complaint*. Although the presentation did not have to take place on June 9, he told her to just get through the presentation. *Opposition Memo* p. 5. On the evening of June 7, Plaintiff was working on the June 9 presentation. Cawley came by her office for the first time with less than 2 days before the presentation. According to Defendant, it was during this meeting that Plaintiff became insubordinate. By all accounts, Cawley criticized some of the slides Freadman proposed to use. However, even Lyndalu Pierunzi, who was present, only said there was "some tension." Cawley said to "shorten the presentation" but gave Freadman no suggestions on how to do this, and did not say anything in regards to the time allotted. He focused mostly on the slides. *Freadman Deposition* p. 241, 243, 244, R&R p. 11.

The following day, Freadman had a doctor's appointment. By this time, she was suffering from the symptoms of ulcerative colitis. *Opposition Memo* p. 6. On June 9, Freadman gave the presentation. The time slot allotted was between 10:20 and 12 p.m. *Freadman Deposition* p. 276, *Smith WCC Deposition* p. 54. Although the meeting was running late, no one told Freadman to shorten the presentation any further for that reason. *Freadman Deposition* p. 278. Although she was never told not to do break out groups, Cawley asserts that her failure to do break out groups, and to shorten the presentation, were significant problems with the presentation. The presentation was on a Friday, and Freadman came to work on Monday, although she was very ill by this time. Because of this, she asked to work from home. Although Cawley maintains that he wanted to speak with her about her conduct, he did not do so on June 12, or at any time after the June 7 meeting or June 9 presentation. R&R p. 14.

Instead, on or about June 12, defendants claim that there was a meeting amongst Cawley, Rein and Smith and they talked about rotating Freadman off the EDB project because of her conduct. Freadman came to work and no one said anything even though she met with Smith and even though Cawley said that he wanted to speak to her about her conduct. R&R p. 14.

Freadman was out of the office beginning June 13. As of this time, she was suffering from a flare-up of her ulcerative colitis. *Wolfe Affidavit* ¶ 15, 16. As of June 22, she was still working from home. *Freadman Affidavit* ¶ 14. On that day, she went into the office to meet with Cathy Rein about mentoring issues. *Answers* No. 11, p. 56-57. Rein did not mention anything about June 7 or June 9. *See id.* Freadman told Rein about her ulcerative colitis. *See id.* In fact, Rein already knew about her condition because Cawley had told her that she was "seriously ill." Significantly, neither Rein nor anyone else told her that she was insubordinate or that anyone was considering demoting her. *Answers* No. 11, p. 56-57. Had she displayed such awful conduct, it seems that Rein

would not be meeting with Freadman for purposes of mentoring.

Four days later, Smith called Freadman at home. R&R p. 14-15. He told her she either had to come in or go out on disability. Freadman came in. Smith told her she was being rotated out of EDB and given a job in Desktop Life Cycle Management. This was significant because, among other things, it was in the technical band. According to Freadman, when she displayed her extreme distress over this demotion to Smith, he could do nothing but place his hand in front of his face, turn his head, and say "I cannot say anything about your work." *Opposition Memo* p. 7, *Answers* No. 13, p. 71. After meeting with her new supervisor, Dick Sitkus, who told her that her health was important and that this job would be better for her, Freadman left for the day. *Answers* No. 13, p. 71-72. On June 29, she was hospitalized due to her ulcerative colitis and remained there for the next 95 days. Opposition Memorandum p. 7. Significantly, Met never said anything to Freadman about being insubordinate, or about her allegedly tossing the presentation toward Cawley. It was not until Freadman filed charges of discrimination before the Human Rights Commission that she learned that Met considered her insubordinate. *Answers No. 18*, #19, p. 94. After exhausting her administrative remedies, she filed her complaint in federal court, relying on the ADA, 42 U.S.C. § 12101, the Fair Employment Practices Act, G.L. 1956 § 28-5-1 et seq., and the Rhode Island Civil Rights of Individuals with Handicaps Act, G.L. 1956 § 42-87-1. The Magistrate Judge granted summary judgment in Met's favor on all counts.

## <u>ARGUMENT</u>

### I. PLAINTIFF OBJECTS TO THE MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS ON PLAINTIFF'S CLAIM THAT DEFENDANT FAILED TO ACCOMMODATE HER ON JUNE 2 AND JUNE 26, 2000

Freadman only objects to a portion of the Magistrate Judge's R&R. Although Freadman believes that the Magistrate Judge erred when he granted summary judgment on the failure to

provide reasonable accommodations in July, 1999 and March, 2000, Freadman is not objecting to these findings. *See* pages 21-27 of R&R..

Freadman does object to the Magistrate Judge's decision on the June 2 and 26 accommodation claims. *See* pages 27-32 of R&R. Relying on *Rocafort v. IBM Corp.*, 334 F.3d 115, 120 (1st Cir. 2003). The Magistrate Judge observed that plaintiff must produce enough evidence that (1) she is disabled within the meaning of the ADA, (2) she was able to perform the essential functions of her job with or without reasonable accommodation, and (3) defendant, despite knowing of plaintiff's disability, did not reasonably accommodate it. Although defendant moved for summary judgment on the first two prongs, the Magistrate Judge assumed that Freadman satisfied these elements. *See* page 20 of R&R.[3] The Magistrate Judge's focus was on the third prong. For the reasons set forth below, it is clear that the Magistrate Judge erred.

A. **The Magistrate Judge's Decision.**

**The June 2 Request**

Relying on *Reed v. LePage Bakeries*, the Magistrate Judge found that the June 2 request was not "sufficiently specific, direct and linked to a disability to constitute a request for accommodation so as to trigger a duty to enter into the interactive process." *See* page 30 of R&R.. With respect to his ruling on vagueness, the Court relied on Freadman's recollection of a conversation she had with Bob Smith.

It is important to place this conversation in context. During the spring of 2000, Freadman

[3]Freadman does not appeal any of the assumptions made in her favor by the R&R. To the extent this Court finds it necessary to make specific findings regarding any of the Magistrate's assumptions, Freadman relies on the arguments she made in "Plaintiff's Revised Memorandum In Support Of Her Objection to Defendant's Motion For Summary Judgment" ("opposition memorandum") as well as her arguments during the hearing. The opposition memorandum is the document upon which the Magistrate Judge and Freadman rely.

began having some bouts of diarrhea. *See* page 17 of *Opposition Memo*. From about the middle to end of April, Freadman had what she described as a "rough couple of weeks." *Id.* As of the time of her June 2 request, Freadman was "very ill" and had all the symptoms of ulcerative colitis including weakness and diarrhea. *Id.* at 17-18. She was in a "lot of pain," had bleeding and increased diarrhea. *Id.* According to her doctor, her ulcerative colitis was flaring. *Id.* Freadman was having diarrhea about twelve to fourteen times a day. *Id.*

On June 2, Freadman met with Bob Smith. She told him that she was working too hard and that she needed to take some time off because she was not feeling well and "her symptoms were returning." *See* Complaint ¶ 2.[4] Smith told Freadman to "just get through the presentation on June 9" and then "take your time off." The essence of Freadman's June 2 accommodation claim is that she sought to take time off right away. Smith refused this request and told Freadman to take her time off after the June 9 presentation.[5]

Relying on *Reed v. LePage Bakeries*, 244 F.3d 254 (1st Cir. 2001), the Magistrate Judge found that the fact that Freadman wanted to take time off right away could not reasonably be inferred from Freadman's statement to Smith. Also relying on *Reed v. LePage*, the Magistrate Judge found that

> "Plaintiff did not adequately link her request to her disability . . . . the vague statement that 'some of my symptoms may be returning,' . . . was insufficient to reasonably alert Smith that Plaintiff needed any accommodation because of a disability. In addition, the fact that Plaintiff was not certain that her symptoms were returning, as evidenced by her words, 'may be

---

[4]In her deposition, Freadman testified that the words she used were: "working very hard, too hard, and that I needed to take some time off because I'm starting not to feel well, and I told him that some of my symptoms may be returning." *Opposition Memo* p. 5.

[5]It is undisputed that the June 9 presentation could have been postponed.

> returning,' makes it doubly unreasonable to find that Plaintiff was requesting an immediate accommodation and that the accommodation was linked to her disability." See R&R p. 29-30.

Placing no burden on Smith, the Magistrate Judge found that, to the extent Smith did not respond to her liking, Freadman "was obliged to tell Smith that she could not wait until then and that she needed to take time off immediately."[6] Under these circumstances, the Magistrate Judge concluded that there was no obligation on the part of Smith to engage in the interactive process. *See* page 30 of R&R. Significantly, the Magistrate Judge did not find that Freadman's request was unreasonable or unduly burdensome.

<u>The June 26 Request</u>

Before turning to the actual request, it is also important to place it in some context. This request was made three days before Freadman was hospitalized. By this time, her condition was even worse. She had lost over nine pounds in about a two-week period and her symptoms included abdominal cramping every few hours and bloody bowel movements ten times a day. *See Opposition Memo* at 18. Freadman had been out of work since June 13. On the morning of June 26, she called her secretary to tell her that, because of her condition, she was going to continue to work from home.[7] Presumably after talking to Freadman's secretary, a short time later, Smith called Freadman at home. Freadman testified about their conversation:

> "Bob Smith told me that I needed to come into work today, and I said, 'But, Bob, I'm still sick. Can't I come in tomorrow?' And he said, 'No, you have to come in the office today. You have two

---

[6]Indeed, this supports Freadman's contention that defendant's claim of insubordination is a pretext for discrimination.

[7]On the same page referenced by the Magistrate Judge, Freadman testifies that her secretary knew that her ulcerative colitis was flaring. *See* Freadman Deposition at 91.

> choices. You go out on disability or you come in the office.' There's changes in the department that affect you.' And I said, 'But I can't come in tomorrow? I'm sick.' He said 'No." Freadman's Deposition at 91-92; see also R&R p. 30-31.

Unlike the June 2 request, the Magistrate Judge did not find that Freadman's request was not "sufficiently direct and specific." However, like the June 2 request and again relying on *Reed v. LePage*, he did find that Freadman had not sufficiently explained how the accommodation was linked to her disability because Freadman "merely said that she was sick" which gave "no indication that her then indisposition was connected to her disability." *See* pages 30-31 of R&R. The Magistrate Judge completely discounted what Smith knew about Freadman's disability before the conversation of June 26, when he wrote:

> "Plaintiff asserts that 'Smith knew of the severity of Plaintiff's medical condition when he visited her at home . . . ." SDF 10 and that 'Smith knew that Plaintiff was ill prior to the June 9 . . . presentation,' SDF 42. It is not reasonable to infer or conclude that Smith would have known from Plaintiff's June 2 statement that 'some of my symptoms may be returning,' . . . and her non-specific statement on June 26, 2000, that she was 'still sick,' . . . that her sickness was connected to her ulcerative colitis as opposed to some other illness and that Plaintiff was requesting an accommodation based on her disability. It is even less reasonable to conclude that Smith would have known on June 26 that Plaintiff's sickness was related to her ulcerative colitis based on comments made to him some thirteen months earlier. Since returning to work, Plaintiff had been almost symptom free since, *see* Complaint 36, giving Smith little reason to connect Plaintiff's May, 1999, statements to being sick on June 26, 2000." R&R p. 31.

Finally, the Magistrate Judge found that Freadman's request was not reasonable. He stated:

> "Plaintiff had not reported for work in Smith's department for two weeks. She had asked Smith on Monday, June 12, if she could take the rest of the week off by taking personal days and by working at home for 'a couple of days,' Plaintiff's dep. At 84, and Smith had said yes . . . . However, Plaintiff had continued working at home for more than a week beyond what Smith had authorized, and she had not

> sought permission for this extension. In light of this, Plaintiff's request that she be allowed to continue to work at home was not on its face reasonable." See R&R p. 31-2.

With all due respect for the Magistrate Judge, he has plucked his findings out of thin air. The following amply supports this.

First, the Magistrate Judge should have only considered the facts and arguments made in defendant's submissions when considering which theories on which to grant summary judgment. Turning to defendant's motion for summary judgment, regarding the June 2 request, defendant did not argue that the request was unreasonable or that it was not sufficiently linked to her disability. Rather, defendant said that:

> "Met allowed Freadman to work from home during the week of June 12 and up to June 26, 2000. On June 26, Smith merely asked her to come to the office so he could advise her, in person, of her job rotation. Assuming as true Freadman's allegation that she asked for time off as an accommodation on June 2, such a request is legally deficient as she merely told Smith that she was 'ill.' Clearly, such a vague term is insufficient to begin the interactive process of reasonable accommodation . . . ." Defendant's Memorandum p. 16

Citing *Phelps v. Optima Health, Inc.*, 251 F.3d 21, 28 (1st Cir. 2001), the defendant further argued that Smith was not obligated to accommodate Freadman on June 2 just because "Smith had altered Freadman's job duties in July, 1999 at her request." *Id.* Turning to its reply, the only reference to the June 2 request is: "Chris Cawley did testify that Freadman's June 9 presentation could have been postponed. Freadman, however, did not tell Cawley that she was ill prior to the presentation . . . . Finally, Met allowed Freadman to work at home from June 12 to June 26 . . . ." *See* page 13 of Reply.[8] Turning to defendant's treatment of the June 26 request, there is <u>not</u> even a passing

---

[8]Like the motion for summary judgment, the remaining discussion in Defendant's Memorandum relates to the accommodations in July, 1999 and March, 2000.

reference to it in either defendant's motion for summary judgment or its reply. The only possible reference in defendant's statement of undisputed facts is paragraphs 40 and 41. They read, respectively:

> "Freadman never told Cawley that she was feeling ill prior to the June 9, 2000 presentation. (Freadman Dep., p.74) . . . . Freadman never told Smith that she was suffering the symptoms of colitis prior to June 9, 2000, and, according to Freadman, merely told him she was not 'feeling well' on June 2. (Smith Dep. Pp. 159-160;Answer No. 10, p.56)."
>
> "Freadman worked at home between June 13 and June 26. (Freadman Dep., p.90; Smith Dep. P. 140). See Defendant's Memorandum p. 8-9.[9]

Finally, turning to Smith's Affidavit, there is absolutely no reference to either the June 2 or June 26 requests. There is nothing about not knowing what she was asking for, nothing about it being unreasonable, nothing about it being unduly burdensome. In fact, if anything, with respect to the June 2 request, Smith's response – that Freadman should wait and take time off after the presentation on June 9 – confirms that he knew there was a sense of urgency.[10] Similarly, although defendant addresses the unreasonableness of the May, 1999 and March, 2000 requests, there is nothing on the June 2 one.

The Magistrate Judge has erred in other ways. First, he assumed that Freadman satisfied her burden of proving that – primarily through Smith – defendant perceived Freadman as disabled. *See* page 20 of Report and Recommendation. As Freadman's opposition memorandum makes clear, this

---

[9]This is in stark contrast to the July, 1999 and March 2000 accommodation requests.

[10] Interestingly, had he afforded this accommodation perhaps there never would have been a problem with the June 9 presentation. If an employee has informed an employer of the need for an accommodation and the employer disciplines the employee for misconduct that an accommodation might have prevented, courts have found a violation of the ADA. *See Despears v. Milwaukee County,* 63 F.3d 635 (7th Cir. ).

necessarily means that Smith knew that Freadman had a disability as of June, 2000. *See* pages 19-22 of Freadman's opposition memorandum. Thus, the claim that there was insufficient linkage between Freadman's requests and her disability are without merit.[11]

Second -- even in the absence of argument or disputed facts -- the Magistrate Judge concluded that the June 26 request was unreasonable. This is flawed for a number of reasons. For example, under the Family & Medical Leave Act, Freadman would have been entitled to twelve weeks -- many more than she had taken as of June 26.[12] Furthermore, defendant did not consider her absence unreasonable. In fact, they claim that, when Smith called Freadman on June 26, it was not for the purpose of ending her leave. Rather, it was to have her come to the office that day so she could be told about the changes in her job.

Third, the Magistrate Judge observed that, after Smith told Freadman that she could take time off after June 9, she should have followed up with a more emphatic statement that she needed to take time off immediately. However, Freadman was under no such obligation.[13]

---

[11]Indeed, the fact that Smith told Freadman that she had to either come in on June 26 or go out on disability demonstrates that Smith knew that she was disabled.

[12]Indeed, the First Circuit has held that a medical leave that exceeds in duration that allowed by the company (one-year) is not per se unreasonable. *See Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638 (1st Cir. 2000).

[13] It should be noted that there are cases where no request is needed. *See LePage*, ("Sometimes the employee's disability may prevent the employee from requesting an accommodation, or sometimes the employee's need for an accommodation will be obvious; and in such cases, different rules may apply."). If it appears to an employer that an employee may need an accommodation but does not know how to ask for it, the employer "should do what it can to help." *Bultemeyer*, 100 F.3d 1281 (7th Cir. 1996). It cannot sit by and expect "an employee to read its mind and know that he or she must specifically say 'I want a reasonable accommodation,' particularly when the employee has a mental illness. The employer has to meet the employee half-way." *Id.* This means an employer must make a reasonable effort to determine the appropriate accommodation.

Fourth, the Magistrate Judge found that it was not reasonable to infer that Smith knew that Freadman needed an immediate leave and that this was linked to her disability. Yet, the fact that Smith told Freadman she could take time out of work but just not until after June 9 and the fact that she was allowed to take time out of work after June 12, obviously means that Smith knew that Freadman's request was, not for something like the flu, but was because of her ulcerative colitis.

Fifth, the Magistrate Judge concluded that Smith was not sufficiently on notice that

---

Significantly, this is not limited to cases involving mental disabilities. This exception also applies to situations in which an employee does not know how to ask for an accommodation because the employer has failed to comply with posting requirements. *See, e.g., Leicht v. Hawaiian Airlines, Inc.*, 15 Fed.Appx. 552, 555, 2001 WL 884708 (9th Cir. 2001) ("If an employee cannot make the request and 'if the company knows of the existence of the employee's disability, the employer must assist in initiating the interactive process.' . . . Moreover, 'employers must notify applicants and employees of the reasonable accommodation provisions, who is entitled to an accommodation and what is necessary to trigger the interactive process.'"); *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, ___n. 5 (9th Cir. 2000), *reversed on other grounds*, 535 U.S. 391 (2002) (after stating that, where employee is unable to make such a request, employer must assist in initiating interactive process if it knows of existence of disability, court states in footnote: "In keeping with the statutory requirements, employers must notify applicants and employees of the reasonable accommodation provisions, who is entitled to an accommodation and what is necessary to trigger the interactive process.") (*citing* 42 U.S.C. Section 12115)).

In addition, if an employee's disability and the need to accommodate it are obvious, an employee is not required to expressly request a reasonable accommodation. *Campbell v. Wal-Mart Stores, Inc.*, 272 F.Supp.2d 1276 (N.D. Oka. 2003) (*citing Norris v. Allied-Sysco Food Serv.*, 948 F.Supp. 1418, 1436 (N.D.Cal. 1996), *aff'd* 191 F.3d 1043 (9th Cir. 1999) and 29 C.F.R. Section 1630.2(o))3)). In this case, an employer must initiate. *Campell,* 272 F.Supp. 2d at 1276. Employers also have a continuing obligation to accommodate employees with covered disabilities. See also *Stephenson v. United Airlines, Inc.*, 9 Fed.Appx. 760, 2001 WL 580459 (9th Cir. 2001) (citation omitted). The continuing duty is also triggered where the employer is aware that the initial accommodation is failing and further accommodation is needed. *Id.* Another example is if an employee cannot make a request and the company knows of the existence of the employee's disability, the employer must assist in initiating the interactive process." *Leicht v. Hawaiian Airlines, Inc.*, 15 Fed.App. 552, 2001 WL 884708 (9th Cir. 2001). An employer's refusal to participate in the process may itself constitute evidence of a violation of the statute. *See Jacques v. Clean-Up Group, Inc.*, 96 F.3d 506, 515 (1st Cir. 1996). The determination whether there should have been an interactive process is determined on a case-by-case basis. *See Phelps v. Optima Health, Inc.*, 251 F.3d 21, 27 (1st Cir. 2001).

Freadman's requests were linked to her disability. Contrary to Freadman's arguments, he refused to consider what Smith knew prior to June 2. Yet, in determining whether an employer has the requisite "triggering notice," courts routinely examine what information the employer had about the disability before the request. *See, e.g., Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296 (3d Cir. 1999) (court examined prior knowledge); *Cannice v. Northwest Bank Iowa*, 189 F.3d 723, 727 (8th Cir. 1999) (court looked to the employer's pre-existing knowledge of the plaintiff's mental or physical condition as supplemental information concerning plaintiff's limitations and need for accommodation.); *Reed v. LePage*, 244 F.3d 254 (1st Cir. 2001) (court looked to what employer knew previously); *Miller v. Illinois Dep't of Corrections*, 107 F.3d 483, 486-87 (7th Cir. 1997) (same); *Conneen v. MBNA America Bank*, 334 F.3d 318 (3d Cir. 2003). "The quantum of information that will be required will, therefore, often depend on what the employer already knows." *Id.* (*citing Taylor*, 184 F.3d at 313).

Sixth, the Magistrate Judge's reliance on *Reed v. LePage* is misplaced. In that case, the employee suffered from bipolar disorder which caused her to argue and fight with people under stressful conditions. At some point, the plaintiff had a confrontation with an employee at work which caused her to be hospitalized for the next five days. Before returning to work, plaintiff's therapist advised her to ask her employer to accommodate her disability by allowing her to walk away from stressful situations in order to avoid losing control.

When plaintiff returned to work, she met with her boss, Mr. Pelletier. The purpose of the meeting was to discuss her poor attendance record. During this meeting, the plaintiff did not initiate any discussions about accommodations or her mental disability. However, Mr. Pelletier brought up the fight with her fellow worker and he suggested that she should just walk away from situations before they became aggravated. The plaintiff agreed and mentioned that she had planned to propose

that idea herself and even offered to get a note from her therapist. Mr. Pelletier told her that was not necessary. The two then met with her floor supervisor, Mr. Norton, where everyone agreed with the plan with one change: that, after walking away from an employee, the plaintiff should immediately get hold of either Pelletier or Norton.[14]

The plaintiff did not have another episode for about fifteen months. This took place during a meeting with Mr. Norton and a human resources director, Ms. Callahan. Plaintiff had been out of work because of a work-related injury, and the purpose of the meeting was to discuss any restrictions on her return to work. During the meeting, the plaintiff became enraged about something, screamed obscenities at the two, and ultimately walked out. The plaintiff was fired for this conduct.[15]

During her lawsuit, plaintiff argued that she had requested an accommodation that she be allowed to walk away from, not only co-workers, but supervisors as well. She took this position based upon what transpired during the initial meetings with Mr. Norton and Mr. Pelletier. Significantly, the Court did not find that LePage had not request a sufficient accomodation. To the contrary, the Court found that she had requested an accommodation about walking away from co-workers. It was LePage's assertion that the accommodation allowed her to also walk away from supervisors. It was this that the court found was not sufficiently direct or linked to a disability. The Court said:

---

[14]It is important to note that the plaintiff could not recall with certainty whether she used the term "accommodation" during either meeting and she could not unequivocally remember whether or to what extent she revealed that she needed an accommodation due to her mental illness.

[15]After the meeting, the plaintiff did inform the head of personnel that she had a mental illness that caused her to lose control and that she needed an accommodation for it. However, the Court did not consider this because it determined that the information was given too late in the game.

> "Taken in context, the only 'accommodation' Reed ever 'requested' was simply that she be permitted to walk away from conflicts with co-workers in order to go get a supervisor. As the district court recognized, it is a vastly different matter for an employee to be given permission to walk away from a supervisor engaged in the act of supervision. Again, had Reed revealed her mental illness and its consequences in any detail to her supervisors, they might have been expected to construe her self-perceived accommodation request differently. Reed neglected to do so. The only hint she gave of any disability was a vague reference to her therapist, who on earlier occasions had sent notes to LePage indicating Reed was being seen for depression. But Reed gave no notice of the aspect of her illness relevant to the accommodation she sought, namely, her "psychological inability to control rage."

*Id.*

Thus a close reading of *LePage* demonstrates that it helps – not hurts – plaintiff's position. The record is clear that Metropolitan had much more knowledge about Freadman's disability at the time of the June 2 request and even more knowledge at the time of June 26. Moreover, Freadman's communications were much more specific and direct. Clearly, if the Court could find a legally sufficient accommodation in *LePage*, the same conclusion is warranted here.[16]

## II. PLAINTIFF OBJECTS TO THE MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS REGARDING PLAINTIFF'S RETALIATION CLAIM.

Plaintiff only objects to a portion of the Magistrate Judge's ruling and recommendations regarding plaintiff's retaliation claim. Although Freadman believes that her retaliation claim based on the events in July, 1999 clearly establish that she was retaliated against, Freadman does not object to this part of the decision. *See* R&R pages 47-48.

However, she does object to the decision regarding the June, 2000 retaliation. *See* page 48. The Magistrate Judge observed that, to establish a prima facie case of retaliation in violation of the

---

[16] *See also Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12 (1st Cir. 1997).

ADA, a plaintiff must show (1) protected activity, (2) adverse action, and (3) a causal connection between the employee's action and the employer's adverse action. *Gu v. Boston Police Dep't.*, 312 F.3d 6, 14 (1st Cir. 2002). The Magistrate Judge assumed that Freadman proved that the June 26 change in her duties was an adverse action. However, he found that summary judgment was nonetheless proper because Freadman's "June 2 statement to Smith that she needed to take time off, [and] her June 26 request to continue working at home, was [not] sufficiently linked to her disability so as to constitute a request for a reasonable accommodation . . . . Therefore, such requests were not protected activity." *Id.* The Magistrate Judge further found that, even assuming they rose to the level of "protected activity," Freadman failed to prove causation. *Id.*

The Magistrate Judge has erred. The following discussion makes this abundantly clear. First, Freadman incorporates her arguments on the June 2 and 26 requests for accommodation and her causation arguments in the disparate treatment section. Second, even if Freadman's June 2 and 26 communications to Smith did not rise to the level of "legally sufficient" requests for accommodations, that is not fatal to her claim. This is because a plaintiff can assert a claim for retaliation even if she loses her underlying claim of discrimination. *Soileau v. Guilford of Maine*, 105 f.3d 12 (1st Cir. 1997) (plaintiff may assert retaliation claim based upon request for accommodation even if underlying claim of disability fails).

Third, the Magistrate Judge applied the wrong legal standard in determining whether Freadman's June 2 and June 26 requests were protected activity. Contrary to the Magistrate Judge's conclusions, Freadman does not have to prove that her requests rose to the level of actual requests for accommodation. Instead, all she needs to prove is that she had a good faith belief that she was entitled to one. *See, e.g., Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997) (plaintiff need only shown good faith belief that underlying challenged actions of employer violated law);

*Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998) (plaintiff need not show that she suffers from actual disability; instead, a reasonable good faith belief that ADA has been violated suffices); *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 385 (10th Cir. 1984) (concluding good faith belief that Title VII has been violated is sufficient to support retaliation claim); *Munck v. New Haven Savings Bank*, 251 F.Supp.2d 1078 (D.Conn. 2003) (where plaintiff's alleged request for accommodation was ambiguous, vague and not direct, court still found plaintiff had engaged in protected activity); *Butler v. City of Prairie Village*, 974 F.Supp. 1386 (D.Kan. 1997) (citations omitted) (even if plaintiff was incorrect in belief she was entitled to accommodation, she can still pursue her retaliation claim provided she had good faith basis for believing she was entitled to one).

Applying this standard, it is clear the summary judgment is not proper. First, there is <u>nothing</u> – neither legal arguments nor undisputed facts – on this issue. Moreover, it is clear that Freadman had a reasonable good faith belief that, when she was requesting her accommodations on June 2 and 26, that Smith understood what she was asking for and that it was because of her ulcerative colitis. Not even considering the information that Freadman conveyed to Smith on June 2, she had extensive discussions with Smith about her medical condition before June 2. He also knew about her hospitalization and subsequent medical leave of absence.

Third, the First Circuit's decision in *Wright v. CompUSA, Inc.*, 352 F.3d 472 (1st Cir. 2003), confirms that summary judgment was not proper on Freadman's retaliation claim. In May, 1997, Wright was diagnosed with ADD. He told his employer about this in August, 1997. In June, 1998, Wright was assigned to work with a new manager; because of this, he began experiencing severe stress and anxiety on the job. Eventually, he had a panic attack at work and his doctor recommended that he take a leave of absence from work. Wright was granted a two-week medical leave until August 4, 1998. While on leave, he requested a transfer to another store which was denied. He then

requested that he be allowed to work from home which was also denied.

When Wright returned to work on August 5, he gave two letters to his employer: one from his doctor and one from his psychiatrist. The doctor's note approved Wright's return to normal duties and only stated that he was "being treated for a medical condition which required him to take medications." The psychiatrist's note said that he had responded positively to treatment with Ritalin, described the symptoms of ADD and made specific recommendations regarding how the employer could accommodate his symptoms. The psychiatrist's letter also said that Wright's difficulties were caused by increased stress due to his new manager's style.

On August 11, 1998, Wright was scheduled to attend a meeting. Wright failed to attend the meeting and was fired. Wright brought, not only a disparate treatment claim, but a retaliation claim as well. The retaliation claim was based upon his informal requests while he was out on leave that he be transferred or allowed to work from home and the requests by his doctor. After finding that he was not disabled, the Court addressed Wright's retaliation claim. In addition to the doctor's request, the Court found that Wright's more informal requests constituted requests for accommodations.[17]

*Wright* supports the conclusion that the Magistrate Judge erred. Clearly, Metropolitan knew much more about Freadman's disability. Moreover, her requests on June 2 and June 26 were much more explicit than Wright's vague statements.

## III. FREADMAN OBJECTS TO THE MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS REGARDING PLAINTIFF'S DISPARATE TREATMENT.

Freadman objects to only a portion of the Magistrate Judge's report and recommendation

[17]Freadman urges this Court to consider the *Wright* decision when deciding her accommodation claims.

regarding plaintiff's disparate treatment claim. Relying on *Carroll v. Xerox Corp.*, 294 F.3d 231 (1st Cir. 2002), the Magistrate Judge found that plaintiff had to prove (1) she has a disability, (2) that she can nonetheless perform the essential functions of her job with or without reasonable accommodation, and (3) that the defendant took an adverse employment action against her because of, in whole or in part, her disability. The Magistrate Judge assumed that plaintiff satisfied the first two elements of her prima facie case.

He next addressed the third prong: adverse action and causation. With regard to the July, 1999 change in duties, the Magistrate Judge determined that plaintiff had not shown that this was an adverse action and, in all events, failed to prove a causal link between defendant's conduct in July and her disability. *See* pages 34-39 of R&R. Although it is clear that the Magistrate Judge erred, Freadman does not appeal this portion of the R&R.

Still assuming that Freadman had satisfied the first two elements in *Carroll*, the Magistrate Judge limited his focus to whether plaintiff had shown that the June 26 change in duties constituted an adverse action and if there was sufficient causation. The Magistrate Judge assumed that Freadman had suffered an adverse action. *See* page 39 of R&R. However, he determined that there was insufficient evidence on causation and pretext to which Freadman does object. *See* pages 39-47 of the R&R.

**A. <u>The Magistrate Judge Erred On The Issue Of Causation.</u>**

The Court first addressed Freadman's arguments that the timing of events demonstrates the requisite causation. *See* Opposition Memo at pp. 36-39. The Magistrate Judge rejected this argument. *See* pages 39-40 of R&R. Even assuming the Magistrate Judge is correct – which Freadman does not concede – there is other evidence which supports the conclusion that the Magistrate Judge erred.

First, the Magistrate Judge should have denied summary judgment just based on defendant's argument. Defendant essentially argues that summary judgment is proper because it had a legitimate, non-discriminatory reason for changing Freadman's job on June 26.[18] Yet, even assuming defendant has met its burden, this does not mean that the defendant wins or that summary judgment is proper. *Gillen v. Fallon Ambulance Serv.*, 283 F.3d 11 (1st Cir. 2002) (satisfying its burden of showing a legitimate, nondiscriminatory reason for the adverse action "serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext."). In fact, defendant is barred from offering such evidence at the prima facie stage. *See Burns v. Jacor Broadcasting Corp.*, 128 F. Supp.2d 497 (S.D. Ohio 2001) (*citing Cline*, 206 F.3d at 660-61)). For this reason alone, summary judgment was not proper. It makes no sense to allow the legitimate, nondiscriminatory reason offered by the employer at the second stage of the *McDonnell Douglas* inquiry, to determine whether the employee has produced sufficient evidence to establish a *prima facie* case. If this was proper, it would be nearly impossible for any Plaintiff to establish the prima facie case.

Second, the Magistrate Judge concluded that plaintiff failed to articulate any plausible basis for her contention that there is sufficient causation between the June 26 change in duties and her disability. In support of this, the Magistrate Judge relies on certain passages from plaintiff's

---

[18]In fact, defendant admits this in its summary judgment motion where it writes: "Freadman cannot make out such a causal connection because Met has produced overwhelming legitimate business justifications for its actions." *See* page 12 of *Defendant's Memo*. Even their title to the section establishes this: "There is no causal connection between Freadman's alleged protected activity and the alleged adverse action as Metropolitan had legitimate, non-retaliatory reasons for its actions towards Freadman." *Id.*

deposition.[19] *See* pages 40-42 of R&R.[20] In short, plaintiff testified that, after she was placed on the success planning list on March 23, 2002 -- unlike other non-disabled employees such as Jan Kovan, Deb Lee and Ann Foley -- she was not promoted to officer or given any promotional opportunities as is required under the success planning process.[21]

Contrary to the Magistrate Judge's decision, this testimony supports -- rather than undermines -- Freadman's causation argument. A comparison of Freadman with just Jan Kovan demonstrates this. It is not disputed that, prior to June 2, Freadman's career was distinguished. Among other things: (1) she was placed on the Success Planning List for 1998,[22] (2) was invited to the first Leadership Institute in 1998,[23] (3) in 1998 and 1999, she made the list of the top ten females in the company, (4) in 1999, she made a list which included the top twenty-one high achievers in the company, (5) in 1999, she was selected to participate in the Success Planning process, and (6) in 1999, she received the highest performance rating – which only about 20 percent

---

[19]These excerpts were not cited by defendant and no reference is made in its Statement of Undisputed Facts.

[20]In doing so, the Magistrate Judge has raised the issue of such things as similarly-situated persons. Given this -- out of fairness -- Freadman should be allowed to amply explore such issues and to submit additional evidence from the record. *See, e.g., Heisler v. Metropolitan Council*, 339 F.3d. 622, 631 (8th Cir. 2003).

[21]Significantly, before filing its summary judgment motion, defendant was aware that Freadman was claiming that she was treated differently than non-disabled employees in terms of promotional opportunities. *See Defendant's Memo* at p. 13. However, it failed to rebut any of these claims and simply characterized them as "self-created perceptions." *Id.*

[22]Success planning is a developmental process for the top twenty-five employees in the company. The goal is to take these people and give them developmental opportunities so they can continue to advance. *See* Ridge Deposition at 69.

[23]The Leadership Institute is "an opportunity for individuals who [are] identified as having leadership skills, people who [are] identified for potential higher positions, folks who were identified by senior staff as having competencies that would give them the ability to advance through the enterprise." *See* Smith Deposition at 24.

of employees get. On March 23, she again made the Success Planning List.[24]

This is in stark contrast to Jan Kovan – who also worked in the Claims Department headed by Cawley and who is not disabled.[25] Unlike Freadman, she was not placed on the Success Planning List for 1998, was not invited to the first Leadership Institute in 1998, in 1998 and 1999, did not make the list of the top ten females in the company, in 1999, did not make a list which included the top twenty-one high achievers in the company, and in 1999, she was not selected to participate in the Success Planning process. *See* Exhibit A. Like Freadman, she also made the Success Planning List for 2000. Significantly, on August 24, 2000, Kovan was promoted to officer. Freadman was not.[26]

This is significant because Freadman can show that she was treated less favorably than similarly situated employees when attempting to prove causation at the prima facie stage. *Marcano-Rivera v. Pueblo International,* Inc., 232 F.3d 245 (1st Cir. 2000) (citation omitted); Wallin *v. Dept. of Corrections*, 153 F.3d 681, 687 (8th Cir. 1998); *Hopkins v. Electronic Data Systems Corp.*, 196 F.3d 655 (6th Cir. 1999); *Equal Employment Opportunity Commission v. Amego, Inc.*, 956 F.Supp.

---

[24]Significantly, Freadman never learned this until after discovery began in this case.

[25]Cawley testified that he had never directly or indirectly supervised anyone with a disability. (Cawley deposition at 16) At most, this means Kovan was not disabled; at the very least, it means that, if she were, Cawley did not know about it. *See also* Answer No. 2 in "Defendant, Metropolitan Property and Casualty Insurance Company's, Answers to Certain Interrogatories of the Plaintiff by Agreement of the Parties." Because Freadman should be given an opportunity to address the Magistrate Judge's findings on this issue, Freadman attaches the interrogatories to her objection.

[26]In fact, Freadman was surprised by this. *See Answers* p. 40 ("The news of Ms. Kovan's promotion to officer was inconsistent with Mr. Smith's previous poor assessment of her contributions and performance. While acting as her supervisor, Mr. Smith had previously declared that she was not a valuable employee. At one point, he even arranged to have her transferred to another supervisor, Mike Convery, because he did not want to work with her.")

1039 (D.Mass. 1996); *Hansen v. Alta Ski Lifts Company*, 141 F.3d 1184 (10th Cir. 1998) (in determining causation element in retaliation case, court compared treatment of similarly-situated employees outside of protected group).

In the passage upon which the Magistrate Judge relied, Freadman also testifies about not getting any developmental opportunities after she was nominated on March 23. As Smith put it, "making the list is one thing; it is what happens after that which counts." *See* Smith Deposition at 191.A plaintiff can show that she was meeting the employer's legitimate expectations and non-disabled persons received more favorable treatment. A document entitled "Success Planning Follow-up" reflects that, unlike Freadman, Jan Kovan received development. *See* Exhibit A.[27]

Third, the Magistrate Judge also erred because, in deciding the issue of causation, he placed a much heavier burden on Freadman than is allowed at the prima facie stage. *Marcano-Rivera v. Pueblo International, Inc.*, 232 F.3d 245 (1st Cir. 2000) establishes this point. In that case, the First Circuit observed:

> "'In order to facilitate inquiries into whether an employer's adverse employment decision was motivated by an employee's disability, courts generally use the *McDonnell Douglas* burden-shifting scheme.' The basic framework of the *McDonnell Douglas* analysis is . . . [A] plaintiff who suffers from a disability makes out a prima facie case . . . by demonstrating that she is a member of a protected group who has been denied an employment opportunity for which she was otherwise qualified. Such a showing gives rise to an inference that the employer discriminated due to the plaintiff's disability and places upon the employer the burden of articulating a legitimate, nondiscriminatory reason for the adverse employment decision . . . . Once [defendant does this], the inference raised by the prima facie

[27]In *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568 (7th Cir. 2001) (ADA plaintiff makes out a prima facie case by showing (1) she is disabled, (2) was meeting legitimate employment expectations of employer, (3) suffered adverse employment action, and (4) similarly situated employees received more favorable treatment). Plaintiff may also use evidence that she was replaced by a person without a disability. *See Marcano-Rivera*, 232 F.3d 245 (1st Cir. 2000);

> case dissolves and the plaintiff is required to show . . . that the employer's proffered reason is a pretext for discrimination."

*Marcano-Rivera*, 232 F.3d at 247 (citation omitted).[28] This decision is consistent with the well-accepted principle that the prima facie case requires only a "small showing." *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir. 2000), which is "not onerous," *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000) and which is "easily made." *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 30 (1st Cir. 2002). This is in contrast to the pretext stage which is more demanding, *Kosereis v. State of Rhode Island*, 331 F.3d 207 (1st Cir. 2003), and which is the stage at which the ultimate question of causation is addressed. *Gillen v. Fallon Ambulance Service, Inc.*, 283 F.3d 11 (1st Cir. 2002) (once employer has articulated reason, focus is then on "main event" or stage at which discriminatory intent is at issue); *see also Hollins v. Atlantic Company, Inc.*, 188 F.3d 652 (6th Cir. 1999); *Ross v. William Beaumont Hospital*, 678 F. Supp. 655 (E.D. Mich. 1988) (after court found that defendant had met its burden of showing legitimate, nondiscriminatory reason for adverse action, court moved to pretext stage where plaintiff could satisfy her ultimate burden by persuading court that a discriminatory reason more likely motivated the employer or indirectly by showing that employer's proffered explanation is unworthy of credence) (*citing Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981); *Goostree v. State of Tennessee*, 796 F.2d 854 (6th Cir. 1986) (at pretext stage plaintiff must show that sex was "but for" cause of her termination).[29]

---

[28]Although the First Circuit found no evidence of causation or pretext, the facts of that case are easily distinguished.

[29]In fact, there is support for the fact that it is error to include causation as part of a prima facie case when using the *McDonnell Douglas* burden-shifting model. *See, e.g., Lawrence v. National Westminster Bank New Jersey*, 98 F.3d 61 (3d Cir. 1996) (finding that prima facie case means plaintiff proves she is in protected class, her work performance met employer's legitimate

Turning to the case here, it is clear that the Magistrate Judge placed a burden on Freadman which was premature. For this reason alone, summary judgment is not warranted.

Even if something more than that articulated in *Marcano-Rivera* is required, summary judgment is still not warranted. First, courts have held that a plaintiff can use evidence that a disabled person was replaced by someone outside the protected category. *See, e.g., Marcano-Rivera*, 232 F.3d 245 (1st Cir. 2000); *Hopkins v. Electronic Data Systems Corp.*, 196 F.3d 655 (6th Cir. 1999). Freadman was replaced by Chet Kosak who was not disabled. See footnote 25. This alone establishes the requisite causation especially at the prima facie stage.

**B. The Magistrate Judge Erred On The Issue Of Pretext.**[30]

Freadman objects to the Magistrate Judge's findings on the issue of pretext. *See* pages 44-47. The reasons for her objections are set forth below.

First, defendant's argument on pretext -- which takes up a mere one page -- is nothing more than what it argued for causation: that summary judgment is proper because Freadman cannot dispute that it changed her duties on June 26 because of her conduct on June 7 and 9. Presumably believing that the only way that Freadman can meet her burden is by showing the falsity of

---

job expectations and her employment was terminated, court reversed lower court's decision which required disability plaintiff to prove causation at prima facie stage); *Monette*, 90 F.3d at 1185 (plaintiff in disability case need only show she is disabled, is otherwise qualified for the job with or without reasonable accommodation, suffered adverse employment decision and employer knew or had reason to know of her disability and after rejection or termination position remained open or disabled individual was replaced); *Hollins v. Atlantic Company, Inc.*, 188 F.3d 652 (6th Cir. 1999) (prima facie case of disparate treatment is: she is member of protected class and for same or similar conduct she was treated differently from similarly situated non-minority employees).

30

Although the Magistrate Judge decided that he did not have to address the issue of pretext because Freadman had not made out a prima facie case, based upon his decision, Freadman assumes that he did. To the extent the Court finds that the issue of pretext was not addressed, Freadman objects to this.

defendant's articulated reason, defendant writes:

> "She has no evidence that Met's explanation for the allegedly adverse employment actions were factually false. Assuming, *arguendo,* that Cawley was mistaken about his June 7th directive to Freadman regarding breakout sessions, the evidence is undisputed that he directed her to shorten the presentation and that it ran into the lunch hour, which required Cawley to end it . . . . Freadman's failure to follow his directive was the genuine and sole motivation for his actions. " Defendant's Memo at 14-15.

The Magistrate Judge should have denied summary judgment on this basis alone. Instead, he essentially did the same thing only embellishing the articulated reason a bit more. He wrote:

> "On the facts of this case, no reasonable juror could find that Metropolitan's legitimate nondiscriminatory reason . . . was pretextual. It is undisputed that Plaintiff was under the supervision and control of Cawley for the Ease of Doing Business Project and that he had authority to make changes in her presentation . . .; that he told her on June 7 to shorten the presentation . . . ; that in response to this directive Plaintiff tossed the presentation on the desk and told Cawley to tell her what to take out . . .; that the June 9 presentation was longer than Cawley wanted . . . ; that Cawley was upset with Plaintiff when he ended the presentation . . . ; and that on Monday, June 12, Cawley told Smith that he did not want Plaintiff to continue as project manager of Ease of Doing Business and to rotate her to another position . . . . The inescapable conclusion . . . is that Plaintiff's conduct on June 7 and 9, 2000 caused Smith to lose confidence in her and that as a result he no longer wanted her working on the . . . Project . . . ." See R&R p. 44-45.

This is plain error. Just because defendant has articulated a legitimate, nondiscriminatory reason, does not mean that summary judgment is proper. This is because, short of falsity, a plaintiff can prove pretext by showing a number of other things. *See, e.g., Faruki v. Parsons*, 123 F.3d 315 (5th Cir. 1997) (inconsistencies and implausibilities demonstrate pretext). For this reason alone, it is clear that the Magistrate Judge erred.

The Magistrate Judge also erred because Freadman more than called into question

defendant's articulated reason. For example, Freadman argued that defendant's claim that Freadman's job change in June 26 was the result of her failure to follow the alleged breakout directive was – at best – false and at worst – inconsistent, undermined and implausible. *See* pages 39-40 opposition. This fact alone should have been enough to defeat summary judgment. Yet, the Magistrate Judge granted summary judgment on pretext essentially because Freadman failed to shorten the presentation on June 9 and had tossed the presentation in Cawley's direction on June 7.

Yet, even these two points are without merit. With respect to shortening, it is undisputed that Freadman was given one hour and forty minutes for the presentation. Although Cawley has given conflicting testimony about how long he expected her part of the presentation to last, it is undisputed that he expected her to take no more than thirty minutes. *See* Cawley Workers Compensation Court Transcript, p. 138. Significantly, although Cawley disputes this, Smith testified that Freadman only took twenty minutes.[31]

Turning to the toss of the presentation on June 9, it is also abundantly clear that this did not motivate Cawley – or anyone else – in changing her duties on June 26. One need look no further that defendant's own statement of undisputed facts in which Cawley states that he "spoke with Barbara Ridge, Met's Vice President of Human Resources, about Freadman on two occasions after June 9th and told her that he was having her rotated into a new position <u>as Freadman ignored his instructions to alter her slides and do away with breakout groups</u>. SUF ¶ 38. Critically, <u>he does not rely on the tossing of the presentation as a basis to rotate Freadman</u>. This is corroborated by the next paragraph in which Met states that "The sole basis for Freadman's rotation was her conduct on June

[31]At oral argument, Freadman made this point. The Magistrate Judge asked Freadman to supplement this record. After the hearing, Freadman submitted the corroborating testimony. *See* page 27 of Smith workers' compensation transcript.

7th and 9th, which made it clear that 'she was going to do what she wanted . . . ." (Emphasis supplied.) SUF ¶ 39. It is inconceivable that defendant would not have included specific reference to the tossing of the presentation – something which Cawley claims he had not seen in twenty-seven years. The fact that the toss did not motivate defendant is further supported by defendant's oral argument. Significantly, the toss was not mentioned there either.[32] Finally – and most glaringly – it is undisputed that Smith spoke with Freadman right after the encounter with Cawley on June 7. Smith never mentioned insubordination or anything else including Freadman allegedly tossing the presentation. This is significant because it is further undisputed that Cawley and Smith spoke right after the ordeal.

The Magistrate Judge erred for other reasons. The Magistrate Judge also rejected Freadman's argument relating to its progressive discipline policy. *See Opposition Memo* at 39. Relying on cases which hold that failure to follow such policies is strong evidence of pretext, Freadman argued that she was never counseled or warned after her alleged insubordination as is required by defendant's own policy. Citing an excerpt from the policy, the Court found plaintiff's progressive discipline argument unpersuasive.[33] The excerpt is from defendant's Human Resources Survival Guide. It reads:

> "[E]xtreme cases such as insubordination . . . are individual in nature and circumstance. When extreme cases presented themselves, the disposition will be determined after gathering all pertinent information and discussion with appropriate management. When a supervisor becomes aware of an extreme situation, it should be reported to management and/or Human Resources immediately."

---

[32]The fact that the toss was not the motivating factor is further supported in the record. *See, e.g.*, Ridge Deposition at 55,57; Frost Deposition at 50, 63.

[33]Significantly, this information is not included in defendant's statement of undisputed facts.

The Magistrate Judge interpreted this language as not requiring "Cawley or anyone else [to] counsel Plaintiff regarding her actions or assignment because insubordination is an "extreme case." Consequently, Plaintiff has not shown that Metropolitan violated its own policies . . . . " *See* pages 45-6 of R&R. Even assuming this is an "extreme case" which excuses counseling - which Freadman does not concede - the language is silent on the issue of counseling. Given the summary judgment standard, any inferences to be drawn from the silence should be in Freadman's favor.

Even if his position on this is warranted, as the following discussion makes clear, this supports – not undermines – plaintiff's pretext argument. First, even assuming this language can be interpreted as not requiring counseling, it still presents a problem for defendant because it indisputably requires that the "disposition [of such extreme cases] be determined after gathering all pertinent information." There is no person who had more "pertinent" information that plaintiff. Yet, despite numerous opportunities after Freadman's presentation on June 9, no one questioned her.[34]

Plaintiff argued that, because she had never been told that she was insubordinate until after this lawsuit started, that this was evidence of pretext. *See* Opposition Memo at p. 39. The Magistrate Judge admitted "that in some circumstances such an omission could be indicative of pretext." However, relying on the self-serving statements of defendant in its statement of undisputed facts as well as excerpts from Cawley and Smith's depositions, he nonetheless found that this is not a case where this should be considered because "[t]he evidence is unrebutted that in the days immediately following June 9, Cawley, Smith and Ridge had discussions about reassigning Plaintiff

---

[34]The Magistrate Judge also found: "The close proximity in time of the incidents on June 7 and 9 to the announcement on June 12 by Cawley that Plaintiff should be rotated into another position effectively negates the possibility of pretext." Here he draws the inference in Defendant's favor.

and the reasons for the reassignment." *See* page 45 of R&R.

Not even considering the fact that this does nothing more than go to the issue of whether defendant had a legitimate, non-discriminatory reason for changing her duties in June, 2000, the Magistrate Judge's reasoning is flawed. Even a cursory examination of Barbara Ridge's deposition testimony confirms this.

Ridge testified that, after the June 9 presentation, she heard that Cawley had asked Freadman to modify some slides but that did not happen. (Ridge Deposition at 53) Although she could not recall the date or the context in which she heard this, she believes it took place after plaintiff's presentation on June 9 and it was not a very long conversation. (Ridge Deposition at 54) During this conversation with Cawley, she only remembers him talking about breakout sessions and slides. (Ridge Deposition at 55) Although she testified that she may have had other talks with Cawley after June 9, these conversations "were not significant." (Ridge Deposition at 58-9) Apart from this, Ridge recalled only one other discussion about Freadman. She guessed this also took place shortly after the June 9 presentation. (Ridge Deposition at 55) She could remember nothing being discussed other than the fact that Freadman was going to be rotated to another department. (Ridge Deposition at 58) She believes the conversation was with Richard Sitkus or Smith. (Ridge Deposition at 58) When pressed about whether she had any discussions about Freadman's job changing because of her conduct on June 9, she only said "I think that was a factor." (Ridge Deposition at 59) She is asked why and states "there was some concern about probably the need to move her out of the role into a position where she might be more closely supervised." (Ridge Deposition at 59) Other than this, Ridge received no other information about Freadman's conduct on June 9. (Ridge Deposition at 60) She was asked if she was aware of any other performance problems with Freadman other than her

conduct on June 9 and she could not remember any. (Ridge Deposition at 72) Finally, Ridge testified that Freadman was never involved in the company's disciplinary process. (Ridge Deposition at 72)

The Magistrate Judge placed great weight on the manner in which Freadman was treated by defendant. Yet, most of the things like salary increases and bonuses were given before June 2. Moreover, on the issue of bonuses, it is undisputed that Freadman received a bonus in 2001 for her performance in 2000. If Freadman had been as insubordinate as Cawley now claims, clearly she would not have received one.[35]

## IV. CONCLUSION.

For the foregoing reasons, Freadman respectfully requests that the Court reject the R&R of the Magistrate Judge, reverse the grant of summary judgment in Defendant's favor, and allow this case to proceed to trial.

Plaintiff,

Patricia E. Andrews

Patricia E. Andrews, #4321
170 Westminster St., Suite 601
Providence, RI 02903
(401) 421-0966
(401) 351-4802 (fax)

Robert Mann, #0153
Mann & Mitchell

[35]Plaintiff incorporates her arguments on causation here because courts routinely consider evidence which proves causation at the prima facie stage as evidence in the pretext stage. The reverse is also true and, therefore, Freadman incorporates her arguments on pretext in her section on causation.

1 Turks Head Place, Suite 501
Providence, RI 02903

**CERTIFICATION**

I hereby certify that a copy of the within document has been sent by first-class mail to Steven Snow and Michael Murray, Partridge, Snow & Hahn, LLP, 180 South Main Street, Providence, RI 02903 on the 13th day of July 2005.