# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

MICHELE R. FREADMAN,
Plaintiff,

v.

METROPOLITAN PROPERTY AND CASUALTY INSURANCE COMPANY,
Defendant.

C.A. No. 01-628 ML

## DEFENDANT, METROPOLITAN PROPERTY AND CASUALTY INSURANCE COMPANY'S, MEMORANDUM IN REPLY AND OPPOSITION TO PLAINTIFF'S OBJECTION TO THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE DATED MARCH 31, 2005

## I. INTRODUCTION

Plaintiff, Michele Freadman ("Freadman"), files her present Objection to Magistrate Judge David Martin's Report and Recommendation in a last-ditch attempt to save her case from summary judgment despite the absence of any disputed issue of material fact.

The Magistrate Judge's Report and Recommendation ("Report and Recommendation") is thorough, well reasoned and right. Freadman has not identified any issue of material fact capable of supporting a ruling in her favor. Faced with such compelling analysis, Freadman concedes that the Magistrate Judge was correct in finding that Defendant, Metropolitan Property and Casualty Insurance Company ("Met") did not discriminate or retaliate against Freadman for the period July, 1999 to June 2, 2000 because of her illness. Thus, Freadman is only left with three innocuous claims arising in June, 2000 on which to build her case against Met. In a continuing effort to manufacture a dispute of material fact, Freadman relies upon speculation and personal opinion.

In her Objection, Freadman argues that the Magistrate Judge erred when he granted summary judgment on her claims of failure to accommodate, retaliation, and disparate treatment. As mentioned above, all such claims arise solely out of incidents that occurred in June, 2000 that culminated when Freadman was rotated into a new assignment after completely disregarding her supervisor's instructions to shorten her presentation to Met's officers. As noted by the Report and Recommendation, Freadman's claims arising out of her June 26, 2000 job rotation must fail, as she cannot show a causal connection between this employment action and her alleged disability, nor can she show that she engaged in any protected activity.

The Magistrate Judge also addressed Freadman's alleged June 2, 2000 request to her immediate supervisor, Robert Smith, for time off because she was "not feeling well." The Report and Recommendation correctly concludes that her vague and unspecific request for time off because she was "not feeling well" lacked a legally sufficient specificity as to establish a causal connection between her request and her alleged disability. Furthermore, Freadman failed to produce any evidence that the requested accommodations were reasonable and would not have imposed costs or burdens on Met.

Lastly, the Magistrate Judge discussed Freadman's alleged request to Mr. Smith on June 26, 2000 that she not be required to report to the office on June 26th for a meeting with Smith and that she be allowed to report to work on June 27th. The Report and Recommendation correctly notes that (1) based on the facts in the record, it was impossible for Met to make a causal connection between Freadman's request and her disability, and (2) that Met acted reasonably in requiring Freadman to appear at the office on June 26th given the fact that she had been out of the office, without authorization, for over one week, and (3) that Plaintiff does not argue in her Opposition Memorandum to Met's summary judgment motion that the request was a

request for accommodation. (Report and Recommendation (hereinafter "R&R"), pp. 30-32)). Moreover, Freadman also failed to produce any evidence that her June 26th request was reasonable.

As stated by the Report and Recommendation, Freadman has failed to establish a *prima facie* case on any of her claims. Rather, she bases her claims on unsubstantiated and conclusory statements and personal beliefs. Such conclusions, opinions and beliefs are no substitute for evidence creating a genuine dispute of material facts. The Magistrate Judge's Report recommending summary judgment in Met's favor is correct and warrants adoption by this Court.

## II. A BRIEF SUMMARY OF FACTS

Prior to March, 1999, Freadman was employed by Met as a manager and reported to then Assistant Vice President, Robert Smith. (Met's Statement of Undisputed Facts ("SUF") ¶ 5; R&R pp. 5-6). Freadman agreed that Smith told her in January and May, 1999 to work less and take time off (SUF ¶ 6; R&R pp. 6-7).

From March, 1999 to July, 1999, Freadman was on medical leave as a result of ulcerative colitis (SUF ¶ 7). In May, 1999, Freadman was visited by Smith, who agreed with Freadman's request for a better work and life balance (SUF ¶¶ 8-9; R&R pp.6-7). After four months' medical leave, Freadman initially returned to work on a part-time basis (SUF ¶ 7; R&R p. 7). Part-time work was not normally available to managers, but Met allowed Freadman to work part-time for several weeks (SUF ¶ 15; R&R p. 7, n.5). Upon her return to work, Freadman held the same job, but had some of her duties changed by Smith (SUF ¶ 13; R&R p. 17). In place of some of her old duties, she was assigned a new project entitled "Ease of Doing Business" (SUF ¶ 13; R&R p. 7).

This new assignment did not demote Freadman or lower her status in the company. She had significant duties, including substantial interaction with the senior management of Met (SUF ¶ 14). The Ease of Doing Business project gave Freadman much visibility (*Id.*).

Following her return to work, Freadman never documented a complaint to Smith that she had too much work (SUF ¶ 16).

In early 2000, Smith gave Freadman a performance rating of "5", the highest rating available and which was only received by ten percent of all Met employees (SUF ¶ 17). This rating was higher than the one Freadman received before her illness (SUF ¶ 17).

One month after her return to work in 1999, Freadman received a substantial salary increase of $5,000.00 in August, 1999 (SUF ¶ 18). Five and one-half months later, Freadman received a $4,700.00 pay increase (SUF ¶ 18). In addition, Freadman received a bonus of $25,000.00 in 1999 and $20,000.00 in 2000 (SUF ¶ 19). These bonuses were higher than the one Freadman received before her illness (*Id.*). Smith and Chris Cawley, Freadman's two supervisors, had decision-making authority on these issues (*Id.*).

In 2000, Freadman was selected to participate in a program entitled "Success Planning" (SUF ¶ 21). This program was designed for high-performing employees whose talent was identified and developed (SUF ¶ 20). Smith nominated Freadman for this program (SUF ¶ 21). Throughout 1999 and 2000, Freadman received numerous laudatory awards, notes and e-mails from various officers and supervisors of Met, including Smith and Cawley (SUF ¶ 22).

To aid Freadman in her Ease of Doing Business duties, Met had assigned her a 25-member team (SUF ¶ 23). She was also allowed to replace another employee despite a company-wide hiring freeze (SUF ¶ 23; R&R p. 9).

In May, 2000, Freadman was asked to give a presentation on the Ease of Doing Business project at a meeting of Met's officers on June 9th (SUF ¶ 25; R&R p. 10). Freadman's work for that presentation was under the supervision of Chris Cawley, who had the authority to make changes in her presentation (SUF ¶ 25; R&R p. 10). In an e-mail on May 31, 2000, Freadman asked for Mr. Cawley's input on her presentation (*Id.*).

Freadman claims that in early June, 2000, she began to feel ill and that her colitis again became active (Complaint ¶ 36; R&R p. 10). Freadman had been symptom-free since July, 1999 (R&R p. 10). Freadman did not tell her supervisor, Robert Smith, that she was suffering from symptoms of colitis (SUF ¶ 40; R&R p. 11; Freadman Depo. p. 72). Freadman also did not tell Cawley that she was feeling ill prior to the June 9, 2000 presentation (SUF ¶ 40; R&R p. 11; Freadman Dep. pp. 74-75).

Freadman claims that on June 2, 2000, she spoke to Smith and told him that she was "working too hard and I will need to take some time off" because she was "not feeling well" (Freadman's Ans. To Int. No. 11 at p. 56; Freadman's Ans. To Int. No. 13 at p. 64 and Freadman's Ans. To Int. No. 14 at p. 75; R&R pp. 10-11). Smith denies that Freadman told him that she was sick prior to the June 9, 2000 presentation (Smith Dep. pp. 156-157; R&R p. 11, n.9). Freadman further claims that Smith told her she could take time off after the June 9th presentation (Freadman's Ans. To Int. No. 14 at pp. 75-76).

On June 7, 2000, Cawley, per Freadman's request, stopped by her office cubicle with Smith to review Freadman's presentation (SUF ¶ 26; R&R p. 11). Cawley reviewed Freadman's slides and was critical of some of them, and told her to shorten the presentation (SUF ¶ 26; R&R p. 11). Cawley also maintains that he told Freadman not to conduct "breakout sessions" (Cawley Dep. pp. 156-157, 165). Freadman believed that Cawley's criticism was

unjustified (Freadman Dep. p. 242; R&R p. 11) and was not receptive to Cawley's comments (SUF ¶ 27; R&R p. 11). Freadman described the incident as a "very upsetting, intense period" (SUF ¶ 27; R&R p. 11). Lyndalu Pieranunzi, also present for the incident, stated that there was tension between Cawley and Freadman (SUF ¶ 27; R&R p. 11).

Freadman began to ask Cawley what she should take out of the presentation, and he told her it was her job to make that decision (SUF ¶ 28; R&R p. 11). Freadman then tossed the presentation on the desk in Cawley's direction and demanded that Cawley tell her what to take out (SUF ¶ 28; R&R pp. 11-12). Cawley was surprised by Freadman's actions as no one in his 27 years of business had thrown something in front of him, and he believed her conduct to be insubordinate (SUF ¶ 29; R&R p. 13). Smith, who was present for the incident, characterized Freadman's conduct as "belligerent" (SUF ¶ 29; R&R p. 12).

After the meeting, Cawley told Smith that Freadman's presentation was too busy, had too many slides, and that he did not want breakout groups (SUF ¶ 30; R&R p. 13). That night, Freadman telephoned Smith about the incident (SUF ¶ 31; R&R p. 13). Smith told Freadman that if Cawley wanted her to shorten the presentation, she should do so (*Id.*).

On June 9, 2000, Freadman gave her presentation to Met's officers (SUF ¶ 32; R&R p. 13). The presentation was longer than what Cawley wanted, and Freadman did the breakout groups (*Id.*). Because of time constraints and the length of Freadman's presentation, Cawley got up from his table and announced that there would be no report backs from the breakout sessions, and that lunch would commence (SUF ¶ 33; R&R p. 13). Catherine Rein, Met CEO, was surprised when Freadman conducted the breakout sessions, as Cawley, prior to the presentation, had told her that he had advised Freadman not to conduct such a session (SUF

¶ 34; R&R p. 13). Freadman stated that she knew that Cawley was upset with her presentation when he ended it (SUF ¶ 33).

On the next business day, Monday, June 12, 2000, Freadman came to her office to work. Freadman claims, in her Affidavit, but not her Answers to Interrogatories, that she spoke to Smith and told him that she was not feeling well and that she was going to work from home and take personal days for the remainder of the week (Freadman Aff. ¶ 14; R&R p. 14). Freadman alleges that Smith approved this request (R&R p. 14, n.12).

On the same day, Cawley told Smith that he "couldn't rely upon her [Freadman] to do what he told her to do at a high profile environment . . ." and that he ". . . didn't want her to be the project manager on something that would put her in that position" (SUF ¶ 36; R&R p. 14). Consequently, he wanted her rotated into another position (*Id.*). Smith recommended that she be rotated into a vacant position in the Desktop Life Cycle Management program, and Cawley accepted the recommendation (SUF ¶ 37; R&R p. 14).

Cawley spoke with Barbara Ridge, Met's Vice President of Human Resources, about Freadman on two occasions after the presentation and told Ridge that he was rotating Freadman because she ignored his instructions to alter slides and do away with breakout groups (SUF ¶ 38; R&R p. 14). The sole basis of Freadman's rotation was her conduct on June 7 and 9, 2000 (SUF ¶ 39). Despite her alleged statement to Smith on June 12th that she would only take the remainder of that week off, Freadman worked at home, without authorization, until June 26, 2000 (SUF ¶ 41; Freadman Aff. ¶ 14).

On June 22nd, Freadman met with Met's CEO, Catherine Rein, to discuss mentoring issues (SUF ¶ 42). At that meeting, Freadman did not tell Rein about her physical

condition, nor did she discuss Cawley, Smith or any alleged discrimination or retaliation (SUF ¶ 42).

On June 26, 2000, Freadman telephoned her secretary that she would be working at home because she was "ill" (Freadman Aff. ¶ 15). That same day, Smith telephoned Freadman and told her to come into the office (Freadman Aff. ¶ 15). Freadman claims that she told Smith that she was "sick" and asked to come in the next day (*Id.*). Smith had told her she had to come into the office that day because there were changes in the department that affected her (*Id.*). Freadman came into the office and met with Smith, who advised her of her job rotation (SUF ¶ 44). After meeting with her new supervisors, Freadman remained at work for the rest of the day (R&R p. 16). She went on leave the following day and never returned to her new position (SUF ¶ 47; R&R p. 16).

## III. ARGUMENT

### A. Standard of Review by this Court

Pursuant to Fed. R. Civ. P. 72, the District Court, in reviewing a Magistrate Judge's Report and Recommendation on a party's summary judgment motion, shall make a *de novo* determination upon the record of any portion of the Magistrate Judge's disposition to which objection is made. *See also,* Local Rule 32, U.S. District Court, District of Rhode Island; 28 U.S.C. § 636. The Court may accept, reject or modify the Magistrate Judge's recommended decision. The District Court may accept any portion of a Magistrate Judge's decision and disposition to which no objection is made, provided there is no clear error on the face of the record. *Advance Coating Technology, Inc. v. LEP Chemical, Ltd*, 142 F.R.D. 91 (S.D.N.Y. 1992).

In reviewing a Magistrate Judge's decision "*de novo*", the Court may reexamine all relevant evidence previously reviewed by the Magistrate. *Williams v. Secretary of Health &*

*Human Services*, 541 F. Supp. 201 (S.D. Ohio 1982); *U.S. v. White*, 295 F. Supp.2d 709 (E.D. Mich. 2003). In conducting a *de novo* review, a Court need not consider any argument not seasonably raised before a Magistrate Judge. *Paterson-Leitch Co., Inc. v. Mass Municipal Wholesale Elect. Co.*, 840 F.2d 985 (1st Cir. 1988).

**B. The Magistrate Judge Was Correct in Finding that Freadman Cannot Prove a Failure to Accommodate Claim**

Freadman objects only to the Magistrate Judge's decision on her alleged June 2 and June 26, 2000 requests for accommodation. She does not object to the Magistrate Judge's Report and Recommendation regarding her claims arising in June, 1999 and March, 2000. In those incidents, the Magistrate Judge found that Met did not fail to make any requested accommodation and that the purported requests for accommodation by Freadman were not reasonable or linked to her alleged disability in any way. Accordingly, the record is conclusively clear that Freadman, prior to June 2, 2000, did not suffer any discriminatory or retaliatory action by Met.

In deciding whether Freadman's two purported June, 2000 requests for accommodation were legally sufficient, the Magistrate Judge assumed, but did not definitively rule, that Freadman was able to satisfy the first two requirements of the *prima facie* case for her failure to accommodate claim (R&R p. 20). In order to prove a *prima facie* case, Freadman must produce enough evidence for a reasonable jury to find that (1) she is disabled within the meaning of the Americans with Disabilities Act, (2) that she is able to perform the essential functions of her job, with or without a reasonable accommodation, and (3) Met, despite knowing of Freadman's disability, did not reasonably accommodate it. *Rocafort v. IBM Corp.*, 334 F.3d 115, 120 (1st Cir. 2003). Met, however, argued below, and continues to maintain, that Freadman cannot satisfy any of the three requirements of her *prima facie* case. Met urges this Court, in its

*de novo* review of the case, to revisit these two issues. A review of the record before the Magistrate Judge will make clear that Freadman was not disabled, as she was able to perform the essential functions of her job, with or without a reasonable accommodation, nor was she perceived as disabled by Met.[1]

The Magistrate Judge correctly found that Freadman's purported requests for accommodation on June 2, 2000 and June 26, 2000 were not sufficiently direct and specific and linked to her disability (R&R pp. 2, 28-32). Accordingly, her claims must fail (*Id.*).

1. <u>Freadman's Purported June 2, 2000 Request</u>

Freadman alleges that she made a request for accommodation on June 2, 2000, when she simply told her supervisor, Robert Smith, in conjunction with her performance review, "I'm working too hard and I will need to take some time off because I'm starting not to feel well" (R&R p. 28, citing Freadman Dep. pp. 72-73; see also, Freadman's Answers to Interrogatories No. 11, p. 56, 13, p. 64 and 14, pp. 75-76). The record supports the Magistrate Judge's findings that such requests were not sufficiently direct and specific to give Smith notice that she needed an immediate, special accommodation (R&R p. 28; Met SJ Memo p. 16).

Freadman, in her attack of the Report and Recommendation, first argues that the June 2nd conversation between her and Smith must be placed in context. She then sets out her

---

[1] Met, in its summary judgment motion memorandum (hereinafter "Met SJ Memo"), pointed out that it was insufficient for Freadman to attempt to prove disability by merely submitting evidence of a medical impairment or diagnosis. (Met SJ Memo, p. 3, citing *Toyota Motor Mfg Co.. v. Williams*, 34 U.S. 184, 198 (2002)). Rather, plaintiff must show a substantial impairment of a major life activity (Met SJ Memo, pp. 4-5). Throughout the period July, 1999 to June 26, 2000, Freadman presented no evidence of any substantial impairment of any major life activity (*Id.*). See also, Met's Reply Memorandum to Plaintiff's Opposition to Met's Summary Judgment Motion (hereinafter "Reply Memo"), pp. 3-8. Furthermore, the evidence is clear that she was able to work, without any accommodation, throughout that period (*Id.* at 4). Met, further, never perceived Freadman as disabled. (Met SJ Memo pp. 4-6; Met Reply Memo pp. 8-9). Freadman also failed to produce evidence to establish that she had a record of disability. (Met SJ Memo; Met Reply Memo pp. 9-10). Freadman, in her Answers to Interrogatories, only makes reference to her medical records. Met, however, never saw these records prior to the filing of this action.

Lastly, Met argues that Freadman was not a qualified individual with a disability and was able to perform the essential functions of her job, with or without reasonable accommodation (Met. SJ Memo pp. 6-7; Met Reply Memo pp. 11-12). Freadman cannot prove that she was a qualified individual, as she applied for and received Social Security disability payments from June, 2000 to the date of her reemployment (*Id.*).

June, 2000 medical treatment history. Freadman, however, overlooks the fact that no one at Met was aware of this medical history. In fact, Freadman testified that she never told Chris Cawley that she was feeling ill prior to June 9, 2000 (SUF ¶ 40; Freadman Dep. p. 74). She also never told Smith that she was suffering from the symptoms of colitis prior to June 9, 2000 (SUF ¶ 40; Smith Dep. p. 159; Freadman Answers to Interrogatories No. 10, p. 56; Freadman Dep. pp. 72-73).

If one is going to evaluate the parties' June 2nd conversation in context, other facts in the record must be reviewed. After only a four-month leave beginning in February, 1999, Freadman returned to work at Met in July, 1999 (SUF ¶ 7). After a short period of part-time work, a benefit not normally available to managers, Freadman returned to full-time duty (SUF ¶ 15). After her request to Smith, some of Freadman's job duties were changed and/or assigned to other employees (SUF ¶ 13). Freadman also was placed in a project with high corporate visibility (SUF ¶ 14). Freadman was able to perform her job duties without any type of accommodation (Freadman Dep. pp. 113, 119; Met SJ Memo p. 14). According to Freadman, she worked long hours, nights and weekends, throughout this time period (Freadman Statement of Disputed Facts ¶¶ 15, 16). Neither Smith nor Cawley required her to do so (SUF ¶¶ 9 and 40).

Throughout the period of July, 1999 to June, 2000, Freadman received high performance ratings from Smith and substantial bonuses and salary increases (SUF ¶¶ 17-19). She was nominated and included in a program for high-performing employees (SUF ¶¶ 20-21). She received a number of laudatory awards and notes from Met management (SUF ¶ 22).

At the time of the June, 2000 request, Smith did not perceive Freadman as disabled (Smith Dep. p. 201). Co-workers only knew Freadman had been ill and out of work for a short period of time (Lyndalu Pieranunzi Dep. pp. 54-57; Isabelle Frost Dep. pp. 39-42). Chris

Cawley only knew she had been ill and hospitalized because of a stomach problem (Cawley Dep. pp. 121-131). To his knowledge, she was able to work to perform her duties (*Id.*).

Against this backdrop, Freadman weakly argues that she told Smith, "I'm working too hard and I will need to take some time off because I am starting not to feel well" and that such a statement was a demand for an immediate accommodation of leave because of her colitis.[2] The Magistrate Judge's findings to the contrary are fully supported by the record. First, the purported statement by Freadman was allegedly made in the course of her previously scheduled performance review. It was not a meeting scheduled by Freadman to seek an accommodation or discuss health issues. Second, she did not make an immediate demand for time off. The ordinary meaning of Freadman's words convey a future intent or desire to take time off. Moreover, given the fact that Freadman had performed her job admirably for a year without any episode of illness or accommodation, it is unreasonable to hold that Smith should have inferred that Freadman's vague statement, "I'm not feeling well" and "Some of my symptoms may be returning" were related to her colitis. The Magistrate Judge also correctly pointed out that Freadman's statement that her symptoms "may be returning" indicated that she was not certain whether her symptoms were linked to her colitis at all.

Lastly, and importantly, as pointed out by the Magistrate Judge, Freadman, in the face of Smith's response that Freadman should do the June 9th presentation before taking time off, did not tell Smith, or anyone at Met, that she needed the time off immediately (R&R p. 30). Had she been as sick as she claims, such a request would have been expected. It is also

---

2 Met and Smith deny that Freadman told Smith that she was sick prior to the June 9, 2000 presentation (Smith Dep. pp. 156-157; R&R p. 11). As Freadman claims that Smith made such a statement, the Magistrate Judge, for the purposes of Met's summary judgment motion, assumed that such a statement was made given the requirement that all facts must be viewed in the light most favorable to Freadman. Assuming that Freadman made such a statement, which Met denies, Freadman's claims must still fail for the reasons stated by the Report and Recommendation and this Memorandum.

important to note that Freadman did not offer Smith or Met any medical evidence or documentation supporting her claim of illness or the need for an immediate accommodation.

Given all these facts, the Magistrate Judge was correct in finding that Freadman's June 2nd statement was insufficient to reasonably alert Smith that she needed an accommodation because of a disability (R&R pp. 29-30). Smith was, therefore, under no obligation to commence any type of interactive process to ascertain the meaning of Freadman's vague request for time off. *Reed v. LePage Bakeries*, 244 F.3d 254, 262 n.11 (1st Cir. 2001). Notwithstanding this, Smith, in response to Freadman's unspecific request for time off in the future, granted her permission to take time off after June 9, 2000. Freadman thus received what she asked for and cannot now complain that she meant something different.

2. Freadman's Purported June 26, 2000 Request

As for Freadman's purported June 26th request, Freadman maintains that after she called her secretary to inform her that Freadman would be working at home because she was ill, Smith telephoned her and asked her to come into the office that day to meet with him (Freadman Dep. pp. 91-92; R&R pp. 30-31). Freadman states that she told Smith, "I'm still sick, I can't come in today" (*Id.*). Freadman alleges that Smith stated that she needed to come into the office that day and that she had two choices, "You can go out on disability or you can come into the office" (*Id.*).

Again, Freadman argues that such a request must be placed in context. She again cites to her medical records and symptomology at the time. As stated before, no one at Met, including Smith, was privy to this information at the time. Furthermore, if Freadman's statement is to be placed in context, reference should be made to all the facts set out by Met with regard to Freadman's June 2nd request. See, *infra*, pp. 11-13. To Met's knowledge, Freadman had not suffered any illness or symptoms since her return to work in July, 1999. She also had ably

performed her duties throughout the time period with no accommodation. Furthermore, she also did not share the particulars of her medical condition with anyone other than the two vague statements to Smith that she was "not feeling well" or "still sick." When viewed in light of these facts, it is clear that the Magistrate Judge's finding that Freadman's statement was not connected to her colitis is correct.

Although the Report and Recommendation did not discuss the issue with regard to Freadman's June 26th purported request for accommodation, it can easily be found that Freadman's alleged statement, "I'm still sick, can't I come in tomorrow?" was not sufficiently direct and specific enough to give Smith notice that Freadman needed a 24-hour accommodation. *Reed v. LePage Bakeries, Inc.*, 244 F.3d at 261. Rather than a specific request for accommodation, Freadman's statement appears to be an attempt by an employee to bargain or eke out an additional day off because of an alleged "sickness". It is not reasonable to conclude that such a request could be considered as a request for an accommodation by any factfinder. It is interesting to note that Freadman, in her original summary judgment opposition, did not advance any argument that her June 26th purported request was a sufficiently clear, specific and direct request for an accommodation. (Freadman's Summary Judgment Opposition Memorandum (hereinafter "Freadman Opposition") p. 30).

Furthermore, the findings of the Magistrate Judge regarding the unreasonableness of Freadman's June 26th request to stay home one extra day are well founded. Freadman, by her own admission, on June 12, 2000, asked Smith to take the remainder of that workweek off (Freadman Aff. ¶ 14; R&R p. 31). Smith approved this request (*Id.*). Freadman, however, without any authorization, continued to work at home until June 26th. Smith's alleged response that Freadman come into the office or go out on disability was, thus, not unreasonable. This is

especially so given the fact that Freadman did not inform Smith of the reasons for her absence, nor did she request FMLA leave or submit any medical documentation. When these facts are coupled with Freadman's failure to present any evidence that the additional day off was reasonable and that it would enable her to "effectively perform her job", *Reed*, 244 F.3d at 259, it is evident that the Magistrate Judge's findings were not only supportive of the record, but are, in fact, the only allowable conclusion.

3. <u>Freadman's Other Arguments on the June, 2000 Requests Are Unfounded</u>

Both of Freadman's June, 2000 "requests for accommodation" are legally deficient in another way. Freadman, as part of her burden of proof, must show that her proposed accommodations were reasonable, would enable her to perform the essential functions of her job, and that it was feasible for Met to provide the accommodation under the circumstances. *Reed*, 244 F.3d at 259. Freadman, however, does not offer even one scintilla of evidence that her two purported June, 2000 accommodations would not have imposed additional costs or burdens on Met or would have allowed her to perform the essential functions of her job. Her failure to meet this burden is fatal to her claims.[3]

In her Objection, Freadman misconstrues Met's summary judgment memorandum on these points. She fails to mention that Met argued that all of Freadman's purported requests for accommodation were unreasonable and that she had failed to meet her burden by providing evidence of their reasonableness. (See Met SJ Memo pp. 16, 18; Met's Reply Memo pp. 12-14). In making her argument, Freadman also overlooks the fact that she has the burden of initially

[3] Freadman's June, 2000 claims are also flawed for another reason. The record is clear that Freadman was able to perform the essential functions of her job without the vague accommodations sought by her (Freadman Dep. pp. 113, 119). Freadman's treating physician, Dr. Wolf, testified that the only limitations on Freadman during the period in question were her inability to be exposed to stress and her long work hours. Other than that, she did not need any special accommodation (Wolf Dep. pp. 28, 30).

showing the reasonableness of the requested accommodations, *Reed, supra*, p. 259, and that she failed to introduce any evidence to meet that burden.

In response to the Report and Recommendation's findings, Freadman argues that she was under no obligation to follow up her June 2nd request after Smith told her that she could take time off after June 9th. Freadman cites a number of footnoted cases in support of this contention (see Freadman's Opposition p. 12, n.13). The facts in the cases cited by Freadman, however, are different from those of the present case. Freadman's alleged symptoms in June, 2000 were not visible and were unknown to Met. Thus, her statement that she was "not feeling well" was incapable of giving Smith sufficient notice that her colitis was back. Second, Freadman was a high performing, well educated manager. She was more than capable of explaining her condition and her need for accommodation if she truly desired one. Thus, *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281 (7th Cir. 1996), is inapplicable.

Freadman also argues that the Magistrate Judge's reliance on *Reed v. LePage Bakeries, Inc.*, *supra*, is misplaced. Such is not the case. The Magistrate Judge only cited *Reed*'s analysis of the law regarding failure to accommodate claims. Unlike Freadman, the Magistrate Judge did not seek to factually compare the two cases. Assuming, arguendo, that the facts of *Reed* are relevant, they are similar to the present case. The record is clear that Met did not have sufficient knowledge about Freadman's purported disability in June, 2000. It did have knowledge, however, that Freadman had been at work for a year performing her job admirably and without need for leave or other accommodation. Despite suffering serious maladies in June, 2000, Freadman claims that she merely advised Met that she was "not feeling well" or "still sick". Assuming such a statement was made, Freadman, like the plaintiff in *Reed*, failed to give any notice or information to Met on how the requested accommodations were linked to her

disability. *Reed*, 244 F.3d at 261. In light of the above, the Magistrate Judge was correct in determining that Freadman's failure to accommodate claims be dismissed.

### C. Freadman's Retaliation Claim Was Properly Dismissed by the Magistrate Judge

Again, Freadman only objects to the Magistrate Judge's rulings and recommendations regarding her purported June, 2000 retaliation claims. She does not object to the Court's findings regarding her allegations that Met retaliated against her in 1999. Accordingly, Freadman, by not appealing those findings, concedes that she was not the victim of any retaliatory conduct by Met from July, 1999 to June 2, 2000.

The Magistrate Judge, in ruling on Freadman's retaliation claims arising out of the incidents occurring on or after June 2, 2000, first correctly found that since Freadman's two alleged June, 2000 requests did not constitute a request for reasonable accommodation under the ADA, Freadman was unable to prove one element of her *prima facie* case as she did not engage in protected activity (R&R p. 48). *See also*, *Wright v. Comp USA*, 352 F.3d 472 (1st Cir. 2003).

The Magistrate Judge then assumed that the June, 2000 requests were, in fact, protected activity and found that Freadman's retaliation claims still failed as the two June, 2000 requests were not causally connected to the adverse action suffered by Freadman.[4] Met assumes that the Magistrate Judge relied upon his findings and legal conclusions relative to Freadman's disparate treatment claim in assuming Freadman suffered adverse action (R&R pp. 32-47; Met's SJ Memo pp. 8-11, 20).

---

[4] Although the Magistrate Judge failed to specifically state what the adverse action was, Met assumes that the Magistrate Judge was referring to Freadman's June 26, 2000 job rotation. As will be discussed in this memorandum, Met disagrees with the Magistrate Judge's finding of adverse action and argues that Freadman suffered no adverse action when her job was rotated on June 26, 2000.

1. The Report and Recommendation Was Correct in Holding that Freadman Did Not Engage in Protected Activity and Thus Failed to Establish a *Prima Facie* Case of Retaliation

The Magistrate Judge was correct in finding that Freadman's June, 2000 requests were not protected activity. As discussed previously, the two events were too vague and unspecific to constitute a valid request for accommodation under the ADA. See, *infra*, pp.10-14; R&R pp. 20-32). Therefore, Freadman did not engage in protected activity and, thus, cannot prove her *prima facie* case.

Freadman, in her memorandum, is correct in stating that a retaliation claim may be asserted even when a plaintiff loses her underlying discrimination claim. *Soileau v. Guilford of Maine*, 105 F.3d 12 (1st Cir. 1997). Freadman, however, claims that she did not have to prove that her requests for accommodation were legally sufficient and all that she needed to prove was that she had a good faith belief that she was entitled to a reasonable accommodation (Freadman Memo. P. 17). These arguments were not advanced by Freadman in her summary judgment opposition. As noted by the Magistrate Judge, Freadman's summary judgment opposition first discussed her contention that the June 26th job rotation was an adverse action and then proceeded to an extensive argument that Met's arguments surrounding the issue of pretext were without merit (R&R p. 42, n.26). Thus, Freadman's arguments should not be considered. *Paterson-Leitch Co., Inc., supra.*

Even if this Court considers Freadman's arguments, they are without weight. Her claim that all she need do is prove a good faith belief that she was entitled to an accommodation is not supported by any controlling First Circuit case law. The only First Circuit case cited by Freadman, *Soileau, supra*, is factually different from this case as it involves an employee who was terminated from his employment after requesting a specific accommodation for his depression and submitting detailed medical documentation for it. *Soileau, supra*, p. 14.

Furthermore, only two of the cases cited by Freadman hold that a plaintiff may assert a retaliation claim if he or she has a good faith belief that he or she is entitled to a reasonable accommodation. *See*, *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318 (11th Cir. 1998); *Butler v. City of Prairie Village*, 974 F. Supp. 1386 (D. Kan. 1997). The other cases cited by Freadman involve plaintiffs who, either orally or in writing, objected to their supervisors for practices they believed were a violation of law. Such cases are inapplicable here and hold true to the statutory language of the ADA's retaliation provision.[5]

Moreover, one of the cases cited by Freadman notes that it is not enough that the plaintiff have a good faith belief that the challenged actions of the employer are unlawful. Rather, the plaintiff must also prove that the alleged retaliator knew that plaintiff was involved in protected activity. *Munck v. New Haven Savings Bank*, 251 F. Supp.2d 1078, 1085 (D. Ct. 2003). In *Munck*, the federal district court found that the plaintiff had failed to prove this element of her *prima facie* case. *Id.* at 1087. The Court found this despite the fact that the plaintiff had made a clear request to change work locations because of her hand injury and told the employer the change would enable her to carry out her duties. *Id.*. Given the facts in the present case, including Freadman's alleged vague statements to Smith that she was not feeling well and needed time off, it is clear that Freadman's retaliation claim must fail. *See also, Peeples v. Coastal Office Products, Inc.*, 203 F. Supp.2d 432 (D. Md. 2002) (where depressed employee only informed employer that he was ill and failed to give specific information about his illness, employer entitled to summary judgment as employee's termination was not proximately caused by employee's invocation of ADA rights).

---

[5] 42 U.S.C. § 12203(a) prohibits retaliation against a person "because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this chapter."

Lastly, Freadman's retaliation claims must fail as she has presented no evidence other than bald faced assertions that she did, in fact, possess a good faith belief that she was entitled to an accommodation (Freadman Memo p. 18). This failure to provide evidence in support of her claim of a good faith belief is fatal to her retaliation claim.

2. The Report and Recommendation's Findings on Freadman's Failure to Make a Causal Connection Between Her June, 2000 Requests and Met's Alleged Adverse Action Are Well Founded

The Report and Recommendation found that Freadman did not prove a causal connection between her two June, 2000 requests and the alleged adverse action of her job rotation. The record supporting this finding is uncontroverted. First, the record is clear that upon her return from medical leave in 1999, Freadman suffered no adverse action. Despite a company practice to the contrary, Freadman was permitted to initially work part-time. At her request for a better work/life balance, Mr. Smith reassigned some of Freadman's duties to others and assigned her to a high profile program which gave her considerable interaction with senior management. (SUF ¶ 14; Freadman Dep. pp. 59, 60-62; Freadman Ans. To Int. No. 6, pp. 19, 39). One month after her return to work, Freadman received substantial salary increases and bonuses (SUF ¶¶ 18, 19; Freadman Dep. p. 207). Freadman's two supervisors, Smith and Cawley, played substantial roles in the granting of these bonuses (SUF¶ 19).

Furthermore, in 2000, Freadman was selected to participate in Success Planning by Smith (SUF ¶ 21). Success Planning is a program identifying high-performing employees and developing their talents (SUF ¶ 20). Freadman also received a performance rating of "5" from Smith (SUF ¶ 17; Freadman Dep. pp. 196-197). This rating was the highest rating available and was higher than the one Freadman had received before her illness (SUF ¶ 17; Freadman Dep. p. 202).

Throughout 1999-2000, Freadman received laudatory awards, notes and e-mails from Met officers, including Smith and Cawley (SUF¶ 22). Freadman also made several presentations to Met officers during that period (SUF ¶ 24). Furthermore, as found by the Magistrate Judge and unchallenged by Freadman, Freadman suffered no adverse discriminatory or retaliatory action for the time period running from July, 1999 to June 26, 2000. Lastly, Freadman, throughout this period, did not have any episode of illness and was able to fully and admirably perform her job duties without accommodation or further medical leave.

The evidence is also clear that Cawley had no idea that Freadman was ill (SUF ¶ 40). Likewise, Smith was not informed by Freadman that she was suffering symptoms of colitis (SUF ¶ 40). It is uncontroverted that Cawley, on June 7th, told Freadman to shorten her presentation and that he was upset with her June 9th presentation when she ignored his orders (SUF ¶ 33). It is also undisputed that on the very next work day after the June 9th presentation, Cawley told Smith he could not rely on her [Freadman] to do what he told her to do . . . and didn't want her to be the project manager and that she should be rotated into another position" (SUF ¶ 36). It is also unchallenged that Cawley spoke with Met's Human Resources Vice President after June 9th and told her that he was rotating Freadman to a new job because she ignored his instructions about the presentation (SUF ¶ 38). When all these facts are reviewed, there can be no doubt that the Magistrate Judge was correct in finding that Freadman failed to prove a causal connection between her June, 2000 requests and her alleged adverse action.

In her Summary Judgment Opposition Memorandum, Freadman was only able to point to the timing between her two June, 2000 requests and her June 26th job rotation as proof of causation (R&R p. 39; Freadman Opposition p. 36). Timing, however, is inadequate, by itself, to prove pretext. S*ee, White v. Simpson Industries*, 1 Fed. Appx. 462 (6th Cir. 2001); *Soileau v.*

*Guilford of Maine*, 105 F.3d at 16. Moreover, the larger picture in this case undercuts any claim of causation by Freadman. *Id.* As described above, the factual record is clear that Freadman's two purported June, 2000 requests played no role in her job rotation.

It is inconceivable that Smith and Cawley would retaliate against Freadman because of her two alleged, vague statements that she was "not feeling well" or "still sick and needed some time off". Both officers thought highly of Freadman and treated her accordingly. Furthermore, at her request in 1999, Smith altered her duties to help Freadman achieve a better work/life balance. He also provided her with staff to assist her in her duties, and even allowed her to hire a person despite a company-wide hiring freeze (SUF ¶ 23). When Freadman asked for time off on June 12th, Smith gave it to her. Had Smith or Cawley harbored a discriminatory or retaliatory animus toward Freadman because of her colitis, they would not have treated and rewarded her as well as they did. When her argument is boiled down, Freadman makes the unbelievable assertion that Met treated her very well when they knew she had colitis, but retaliated against her when she merely told her supervisors that she was "not feeling well." Such an argument makes no sense and is unsupportable by the record before the Magistrate Judge.[6]

Met also points out that it is impossible for Freadman's alleged June 26th request for another day off to be a basis of Met's decision to rotate her into a new job position. The record is uncontroverted that such a decision had been made by Cawley and Smith before June 26, 2000 (SUF ¶¶ 36-37). It is also undisputed that Freadman was called into the office on June 26th by Smith in order to inform her of her job rotation (SUF ¶¶ 36, 38, 43). Thus, the June 26th request cannot, as a matter of fact, be considered causally connected to Freadman's job rotation.

[6] The Magistrate Judge's quotation of Freadman's deposition testimony at pp. 121-125 makes it abundantly clear that Freadman does not have sufficient evidence to demonstrate any connection between her colitis and the June, 2000 incidents. Freadman's argument is based on nothing but her own beliefs, opinions and speculation. Freadman lacks admissible evidence sufficient to establish a *prima facie* case of retaliation, including evidence that similarly situated employees were treated differently.

Lastly, Freadman, in her Memorandum, argues that *Wright v. CompUSA, Inc.*, 352 F.3d 472 (1st Cir. 2003) supports her argument that summary judgment on the retaliation claim was not proper. Freadman, however, overlooks many of the facts of this case. In *Wright*, the plaintiff took a medical leave of absence because of his ADD, which was aggravated by his very poor relationship with his new supervisor. While on leave, the plaintiff made two requests. One was for a transfer, and the other was for permission to work at home. Both requests were denied. Upon his return from medical leave, the plaintiff submitted detailed medical documentation and notes to his employer. This documentation set forth his medical condition, his requested accommodations, and how they would accommodate his ADD symptoms. Six days later, Wright was terminated by the supervisor with whom he had clashed when he failed to attend a meeting because he was caring for his injured son.

The facts of *Wright* are far different from those in the present case. Despite Freadman's unsupported allegation, Met did not know about Freadman's medical condition in June, 2000. Additionally, unlike the plaintiff in *Wright*, Freadman was not on medical leave when she made her alleged June, 2000 request. Furthermore, Freadman did not offer Met any detailed medical documentation setting forth her need for any accommodation. Rather, she alleges that she made two vague statements that she was "not feeling well" or "still sick" and needed time off to her supervisor with whom she had an excellent relationship. Moreover, the larger factual picture of the present case undercuts any claim of causation. Accordingly, *Wright* is distinguishable from the case at bar.

The Magistrate Judge, in ruling on Freadman's retaliation and disparate treatment claims, assumed that Freadman suffered adverse action on June 26, 2000 when she was rotated into another position (R&R pp. 39, 48). Met disagrees with the Magistrate Judge's assumption

and urges this Court, in its *de novo* review, to find that Freadman did not suffer any adverse action when she was rotated into the Desktop Life Cycle Program. In its Summary Judgment Memorandum, Met makes legal and factual arguments that conclusively shows that Freadman did not suffer any adverse action on June 26th (Met SJ Memo pp. 10-11; Met Reply Memo pp. 15-17). Met incorporates these arguments herein.

Additionally, should this Court find that Freadman did make out a *prima facie* case on her retaliation claim, summary judgment is still appropriate, given the overwhelming evidence of Met's legitimate business justifications for its actions toward Freadman in June, 2000 and Freadman's lack of evidence showing that Met's proffered business justifications are a pretext for discriminatory or retaliatory conduct. Met argued these points before the Magistrate Judge and reincorporates the arguments herein (*see* Met SJ Memo pp. 11-15, 20; Met Reply Memo pp. 17-20).

### D. <u>Freadman's Disparate Treatment Claim Was Properly Dismissed by the Magistrate Judge</u>

In her disparate treatment claim, Freadman only objects to the Magistrate Judge's findings and rulings on her two June, 2000 "requests" to Robert Smith (Freadman Memo p. 20). Freadman's objections are levied against the Magistrate Judge's rulings on causation and pretext (*Id.*). Freadman notes that the Magistrate Judge, in ruling on her disparate treatment claim, assumed or found that (1) she had a disability and (2) that she suffered adverse action on June 26, 2000 when she was rotated into a new position. Met, again, disagrees with these two assumptions and/or findings and urges the Court, in its *de novo* review of the case, to revisit these issues (*see*, Met SJ Memo pp. 2-11; Met Reply Memo pp. 2-12, 15-17).

In light of Freadman's limited appeal of the Magistrate Judge's Report and Recommendation, there is nothing in the record that demonstrates Freadman was the victim of disparate treatment from July, 1999 to June 26, 2000.

1. <u>The Magistrate Judge Was Correct on the Issue of Causation</u>

The Magistrate Judge was correct in ruling that Freadman could point to no plausible evidence that her June 26th job rotation was due to her alleged disability (R&R pp. 39, 43). The record, as discussed previously, thoroughly supports such a finding, and Met's arguments on causation in relation to Freadman's retaliation claim have equal weight here. Met, therefore, incorporates them herein (*see, infra* pp. 20-24).

Furthermore, Met makes note of the fact that Freadman, in her Summary Judgment Opposition, did not counter any argument by Met that she had failed to meet her *prima facie* burden of showing a causal connection between the alleged disability and Met's actions. Rather, in her Opposition Memorandum, Freadman only addresses the issue of adverse action and pretext (*see*, Freadman Opposition pp. 32, 36-40).

Freadman, in assailing the Magistrate Judge's ruling on causation, advances several arguments, all without merit. Her first argument focuses on the timing between her purported accommodation requests and her June 26th job rotation. Freadman had previously argued that timing was critical in showing causation because every time Freadman took medical leave or requested an accommodation in the past, she suffered adverse action (Freadman Memo p. 20). Freadman, however, has failed to object to the Magistrate Judge's findings that she suffered no adverse discriminatory action from July, 1999 to June 26, 2000. Since the record has no evidence of adverse action during that time, Freadman's argument is hollow.

Second, Freadman argues that Met's summary judgment argument on causation is faulty because Met argued it was entitled to summary judgment due to the fact it had legitimate

business reasons for Freadman's job rotation. In order to make such a last-ditch argument, Freadman misconstrues Met's Summary Judgment Memorandum. A fair reading of Met's entire Summary Judgment Memorandum makes clear that Met applied the proper standard by arguing that (1) Freadman failed to make out a *prima facie* case by establishing causation, (2) Met had legitimate business justifications for its action, and (3) Freadman had produced no evidence that such reasons were pretextual (*see*, Met's SJ Memo pp. 11-15). In any event, the Magistrate Judge, in analyzing the parties' respective positions, utilized the proper legal standard (R&R pp. 32-33, 43-47).

Third, Freadman, in an effort to avoid summary judgment, concocts a new argument not raised by her in her Summary Judgment Opposition Memorandum. She now asserts that she was treated differently from other employees, including a Jan Kovan, and that this evidence establishes her *prima facie* showing of causation (Freadman's Memo pp. 21-23). Freadman's failure to raise this argument before should be deemed a waiver of the argument. Even if this Court should consider Freadman's argument, Freadman has offered no evidence, either in her Affidavit or Statement of Disputed Facts, that would allow a finding in her favor. Nor can she. There is no evidence in the record that shows that Freadman was similarly situated as Ms. Kovan. Thus, there is no evidence to determine whether Ms. Kovan was disabled, whether she had similar job performance and disciplinary records, whether she had similar job development opportunities, whether she held a comparable position, or what factors led to her promotion.[7] In place of such evidence, Freadman relies on conclusory assertions and her own opinions and beliefs (*see* Freadman Ans. To Ints. Nos. 7, 13, pp. 46, 67; Freadman Dep.

---

[7] Met notes that Freadman states in her Memorandum that Kovan's promotion to officer occurred after June, 2000, when Freadman was no longer actively employed by Met (Freadman Memo p. 23).

pp. 121-125).[8] The Magistrate Judge made such an observation, and it is well supported by the record (R&R pp. 42-43).

Lastly, Freadman attempts to change well settled law when she argues that the Magistrate Judge placed a too-heavy burden on her at the *prima facie* stage (Freadman Memo pp. 24-26). She appears to argue that the issue of causation should not be considered a part of her *prima facie* case (*Id.*). Such an argument overlooks recent First Circuit case law that reaffirms a plaintiff's requirement to prove, as part of a *prima facie* case, that the employer took adverse actions against the employee because of the employee's disability. *See*, *Wright v. CompUSA*, 352 F.3d 472 (1st Cir. 2003); *Carroll v. Xerox Corp.*, 294 F.3d 231 (1st Cir. 2002). Consequently, the Magistrate Judge did not commit error, and utilized the proper evidentiary standard.

2. The Magistrate Judge Did Not Commit Error on the Issue of Pretext

The last issue raised by Freadman's Objection is that the Magistrate Judge erred on the issue of pretext (Freadman Memo pp. 26-32). In response to Met's arguments (Met SJ Memo pp. 11-15), the Magistrate Judge correctly found that it was undisputed that Freadman was under the supervision of Cawley for the "Ease of Doing Business" project and that he had the authority to alter her June 9th presentation (R&R p. 44; SUF ¶¶ 25, 26). It is also undisputed that he told Freadman to shorten the presentation on June 7th and that the meeting between Cawley and Freadman was filled with tension (*Id.*). Further undisputed is the fact that Cawley was upset with Freadman when he abruptly ended her presentation on June 9th (p. 44). More importantly, it is undisputed that on June 12th, the next business day after the June 9th presentation, Cawley told Smith to rotate Freadman into a new job as he "could not rely upon her

[8] Freadman, in her Memorandum, makes several allegations of fact relative to Freadman and Ms. Kovan, but fails to cite any factual support in the record for these assertions (Freadman Memo p. 23).

to do at a high profile environment. . . ." (SUF ¶ 36). It is also uncontroverted that Cawley had a similar conversation with Vice President of Human Resources Barbara Ridge after June 9th (SUF ¶ 30). Such evidence clearly supports the Magistrate Judge's finding that "the inescapable conclusion of such evidence is that plaintiff's conduct on June 7th and June 9th caused Cawley to lose confidence in Freadman and that as a result, he did not want her working for him on the project" (R&R p. 44).

Furthermore, the evidence in the record as a whole negates the possibility of pretext (R&R p. 45). There is unrebuttable evidence in the record that Smith and Cawley, prior to June 26, 2000, thought highly of Freadman and placed her in a high visibility position. Throughout 1999 to June, 2000, Smith and Cawley gave Freadman large salary increases and bonuses, and she received the highest performance rating available. Additionally, the two men nominated for Freadman for the Success Planning Program and allowed her to hire an employee despite a company-wide freeze. Given these facts and the ones discussed above, the only possible inference that can be drawn is that Freadman's conduct on June 7th and June 9th was the sole cause of her June 26th job rotation. There is no evidence in the record to support a finding of discrimination, and Freadman's unsupported speculation is not enough to defeat summary judgment.

In response to the Magistrate Judge's findings on pretext, Freadman can only offer several other weak arguments. Freadman attempts to attack the Report and Recommendation by arguing that Met and the Court believe that the only way Freadman could prove pretext is by showing the falsity of Met's proffered reasons. First, Met did not state that Freadman could only prove pretext by showing the falsity of Met's reasons (*see*, Met SJ Memo p. 14). Second, Freadman has never rebutted the truthfulness of Met's proffered reasons nor

offered any evidence that would call into question Met's reasons for its actions. Instead of evidence, Freadman offers nothing but speculation and personal opinion.

Freadman's argument about Met's assertion that Freadman failed to obey Cawley's instructions on breakout sessions is without weight given the unrebutted fact that Cawley also told her to shorten the presentation and Freadman failed to abide by this instruction. Furthermore, Freadman has not offered any evidence, other than her own unsubstantiated allegations, to show that Cawley never mentioned breakout sessions at all. The record is clear that the other witnesses (Smith and Pieranunzi) were either not present for the entire incident or were unable to remember if the issue was discussed (Pieranunzi Dep. p. 38; Smith Dep. pp. 124-126).

Freadman's argument about the length of the June 9th presentation is also without merit. Although Freadman states that Cawley expected Freadman to take no more than thirty minutes (Freadman Memo p. 28), her presentation took over one hour (Cawley Dep. p. 167; Smith Dep. p. 133).

Freadman makes another baseless argument. She alleges that the Magistrate Judge wrongly rejected her argument relating to Met's progressive discipline policy (Freadman Memo p. 29). Freadman argues that Met failed to follow its own progressive discipline policy by rotating into another position rather than counseling her. As a result, she claims that such a decision is evidence of pretext. As found by the Magistrate Judge, the policy cited by Freadman states that "extreme cases like insubordination . . . are individual in nature and circumstance" and need not follow the more routine counseling procedure (Ridge Dep. Ex. 1, pp. 11-14). Freadman also overlooks the fact that Met also had a policy of job rotations under which an employee can be moved to assignments for a temporary period of time because of the company's business

needs (SUF ¶ 34). Freadman freely admits that both her "Ease of Doing Business" and "Instrument Panel" assignments were temporary rotational assignments (Freadman Aff. ¶ 13; R&R p. 7). Thus, Freadman's June 26th rotation was fully in accord with existing Met policies.

Freadman also takes exception to the fact that Cawley did not speak or consult with her prior to her rotation (Freadman Memo p. 30). In this case, there was no need, given the "individual nature and circumstances" of this case. Cawley himself had directed Freadman to shorten the June 9th presentation and to do away with breakout sessions, and he was present on June 9th when she ignored his orders. Cawley thus had first-hand, personal information regarding her conduct and had no need to conduct any further inquiry.

Lastly, Freadman, in an attempt to create disputed fact, mischaracterizes the deposition testimony of Barbara Ridge (Freadman Memo pp.31-32). A fair reading of Ridge's testimony makes clear that Ridge had a conversation with Cawley shortly after June 9th in which he advised her that Freadman was being rotated into a new position because she had ignored his instructions to alter her presentation slides and do away with breakout groups (Ridge Dep. pp. 53-54; SUF ¶ 38). She further testified that Freadman's conduct on June 7th and June 9th was the basis for her rotation (Ridge Dep. pp. 55, 59; SUF ¶ 39). She also stated that the reason for Freadman's rotation was the need for her to be more closely supervised (Ridge Dep. p. 59; Cawley Dep. pp. 171-172, 175). Ridge's testimony thus corroborates the testimony of Cawley and conclusively establishes that Freadman's June 26th rotation was not the product of discriminatory animus.

## IV. <u>CONCLUSION</u>

It is clear that Freadman's claims of discrimination and retaliation must be rejected, as Freadman has failed to prove a *prima facie* case on any of her claims. Freadman's inability to establish (1) that she made legally sufficient and specific requests for accommodation

and (2) a causal connection between her alleged disability and the purported adverse action suffered by her are fatal to her claims. Met, on the other hand, has offered overwhelming evidence that its actions toward Freadman were not motivated by a discriminatory animus caused by her disability. It is uncontroverted that after Freadman's 1999 bout with colitis and resulting medical leave, Met treated Freadman very well. It was only after Freadman, in June, 2000, disregarded her supervisor's directions regarding an important presentation that Freadman was rotated into a new position because her supervisor could no longer trust her to follow his directions. Against such evidence, Freadman's claims wither and must be dismissed.

For the above-stated reasons, Freadman's Objection to the Magistrate Judge's Report and Recommendation should be denied and this Court should adopt the Magistrate Judge's Report and Recommendation and enter summary judgment in Met's favor on all counts of Freadman's Complaint.

METROPOLITAN PROPERTY AND
CASUALTY INSURANCE COMPANY

By Its Attorneys

PARTRIDGE SNOW & HAHN LLP

Michael J. Murray

Steven E. Snow (#1774)
Michael J. Murray (#6404)
180 South Main Street
Providence, RI 02903
(401) 861-8200 - (401) 861-8210 FAX

DATED: September 23, 2005

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a copy of the DEFENDANT, METROPOLITAN PROPERTY AND CASUALTY INSURANCE COMPANY'S, MEMORANDUM IN REPLY AND OPPOSITION TO PLAINTIFF'S OBJECTION TO THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE DATED MARCH 31, 2005 to be served, by first class mail, postage prepaid, on the 23rd day of September, 2005, to:

Patricia Andrews, Esquire
170 Westminster Street, Suite 601
Providence, RI 02903

Robert B. Mann, Esquire
Mann & Mitchell
One Turks Head Building, Suite 501
Providence, RI 02903

Arleen M. York

816468_1/1633-9